(No. 70576.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EDDIE WILLIAMS, Appellant.

*Opinion filed May 19, 1994.—Rehearing denied October 3, 1994.*

4

8

Rita A. Fry, Public Defender, of Chicago (Kyle Wesendorf, Assistant Public Defender, of counsel), for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and Maureen A. Harton, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Eddie Williams, was convicted of

first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)), conspiracy to commit murder (Ill. Rev. Stat. 1987, ch. 38, par. 8—2(a)), and armed violence (Ill. Rev. Stat. 1987, ch. 38, par. 33A—2). Following a separate sentencing hearing, the jury found defendant eligible for the death penalty and found no mitigating circumstances sufficient to preclude its imposition. Accordingly, the trial judge sentenced defendant to death. That sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603(a), 609(a).

### Trial Evidence

The charges arose from the fatal shooting of Valerie McDonald. Valerie was the wife of Louia McDonald and the mother of their two daughters, LaChina and Lakeya, ages 16 and 8, respectively, at the time of the shooting. Louia, LaChina and Lakeya testified, in varying degrees of detail, to the following events.

At approximately 9:30 p.m. on June 23, 1987, Louia picked up Valerie, LaChina and Lakeya at the church attended by them. As they neared their home and were looking for a parking space, both Louia and LaChina noticed a man standing in front of their apartment building on the corner of Winthrop and Glenlake Streets on the north side of Chicago. After circling the block, Louia located a parking space across the street from their building. Valerie was the last to exit the car. As they walked to the building, LaChina noticed that the man she had seen earlier was still on the corner, leaning against the building. The man looked to be in his late 20s, approximately six feet tall, 150 to 160 pounds, with a small mustache and straight hair pulled back into a ponytail.

LaChina unlocked the building's outer door and held it open for the other members of the family. The lights in front of the doorway were on, as were the lights inside

the vestibule. As Valerie approached the doorway, LaChina saw the man from the corner come up behind Valerie and raise his hand to her head. LaChina heard a gunshot and saw Valerie fall. The man then stood directly in front of the door and pointed a gun toward LaChina. Louia had already entered the vestibule when he heard what sounded like firecrackers. He turned and pushed the door closed as he saw the man coming toward it. Lakeya was also inside the vestibule when she heard a shot and saw Valerie on the ground. The man, whose hair was in a ponytail, came up to the glass door and looked inside. Both LaChina and Lakeya shouted that Valerie had been shot. Louia ran out the door and chased the man to a nearby supermarket parking lot. There, the man entered the passenger door of a burgundy-colored Buick Regal, said something like "hit it" or "go, go," and rode away. Louia and LaChina identified defendant in separate lineups and in court as the man who shot Valerie. Valerie died within two days of the shooting.

Louia testified that he reported to the responding police officers that the burgundy car into which the man entered looked identical to the car owned by Geraldine Smith, with whom he had been having an affair since 1985 and with whom he had an infant son. Louia further testified that following Valerie's discovery of the relationship in early 1986, Valerie and Smith had several verbal and physical altercations. On one occasion, the police were called and confiscated a .25-caliber weapon they found in Smith's handbag. A short time before the shooting and murder of Valerie, Louia told Smith that he wanted to end their relationship and reconcile with Valerie. Louia acknowledged that at the time of trial he was still seeing Smith even though she had been arrested and charged in connection with Valerie's murder.

Daniel Posthlewait testified that he was walking with his nephew in the area of Winthrop and Glenlake Streets when he heard gunshots from behind him. He turned and saw a man running toward him with a second man in pursuit. He described the first man as being black, 5 feet 10 inches tall, with a ponytail and some facial hair, and wearing a gray jacket and blue jeans. The man got into a burgundy Buick and twice said what sounded like "Jeff, take off." Posthlewait saw another person in the car but was unable to discern the person's race or gender.

Detective Phillip Mannion testified that at approximately 10 p.m., after obtaining from Louia a description of the offender and the car in which he escaped, Mannion and his partner, Detective Raymond Kaminski, proceeded to Smith's home. Smith voluntarily accompanied the officers to Area 6 police headquarters where she was questioned. Smith told the officers that her niece, Marva Golden, had borrowed her car the previous evening. Smith gave the police Golden's employment address and agreed to take a polygraph examination the next morning. The officers went to Golden's place of employment, but she did not appear for work as scheduled.

Detectives Tony Jin and Ronald Yawger came on duty at 8:30 a.m. on June 24, 1987. Following a briefing by Mannion and Kaminski, they drove Smith and her son to the home of a baby-sitter who told Smith that Golden had called from Smith's home looking for Smith. The officers took Golden into custody and then took Smith for a polygraph examination. Following the exam, Smith was driven home and, with her consent, her car was processed by evidence technicians.

Later that evening, Golden took and failed a polygraph examination. Confronted with the results of the examination, Golden made a statement to Detectives

Kaminski and Bernard Richter implicating herself and a man she knew only as "Eddie" in the shooting of Valerie. Following her statement, Golden agreed to show the detectives where Eddie was staying. Golden and several detectives left Area 6 at approximately 12:15 a.m. on June 25, 1987. Golden first directed the detectives to a house on South Wolcott Avenue, but Eddie was not there. Two detectives remained there while she and the other officers went to a house a few blocks away on South Honore Avenue. Eddie (defendant) was found there and arrested. The specifics of Golden's inculpatory statement and the details of defendant's arrest are recounted in our discussion of defendant's pretrial motion to suppress evidence.

Defendant was transported to Area 6 and questioned by Detective Mannion. Defendant initially denied any knowledge of the shooting, but when advised that Golden had implicated him in it defendant responded that he was not going to "go down alone." He then orally confessed to the shooting of Valerie McDonald. After arresting Smith at her home at about 3 a.m., Mannion had a second conversation with defendant during which defendant repeated his earlier confession. Later that morning, defendant made a third confession to Assistant State's Attorney Joel DeGrazia, who reduced defendant's statement to writing.

Mannion and DeGrazia testified to the following. Defendant related that as he was leaving a tavern on Sunday, June 21, 1987, Golden drove up in a car and introduced him to Smith, who was in the passenger's seat. Golden told defendant that she had some "business" for him if he was interested. The next day, Golden and Smith drove defendant to the north side of Chicago and pointed out the McDonalds' car and apartment building to him.

On Tuesday, June 23, Golden and defendant drove

to the home of Golden's cousin "Tippy." Golden came out with a silver-colored .25-caliber semiautomatic handgun and gave it to defendant. She told him that the plan was that he "take Valerie McDonald completely out" for which Smith would pay him $500, $100 of which Golden would receive for "setting the job." They drove to Winthrop and Glenlake Streets, where they saw the McDonalds' car. When they returned to the intersection after parking Smith's car, the McDonalds' car was gone. A short time later, Golden observed the McDonalds' car approaching. She pointed out Valerie in the back seat, stating "[t]hat is the bitch you have to take out, right there." Golden then returned to Smith's car. Defendant walked across the street and waited next to the McDonalds' building. Valerie was the last person to exit the car. As she was about to enter the building, defendant came up behind her and shot her once in the head. He then fired a second shot into the hallway which Louia and the two children had just entered. However, he did not shoot directly at Louia because Golden had instructed him not to hurt Louia in any way.

Defendant then turned and ran, with Louia in pursuit. Defendant jumped into Smith's car and told Golden to "move it." As they were driving, Golden asked, "[I]s the bitch straight?" to which defendant replied, "Yes, I think she's dead." They returned to Smith's house where defendant was paid for the shooting. Golden kept part of the money, thanked defendant, and drove him home.

Defendant told Assistant State's Attorney DeGrazia that he had been treated fine while in custody, that no one made any threats or promises to him, and that he made his statements voluntarily. After transcribing the statement, DeGrazia read it aloud to defendant and then gave it to defendant to read for himself. After doing so, defendant signed each of the six pages. The statement was completed shortly after noon on July 26, 1987.

Detective Ryan was then dispatched to the home of Olivia "Tippy" Norris for the purpose of recovering the murder weapon. Earlier that day, Norris had denied any knowledge of a gun, but after a conversation with her husband, they retrieved the gun from an abandoned garage where they had hidden it and surrendered it to Ryan. When it was shown to him, defendant identified the gun as the one he used to shoot Valerie. A firearms expert confirmed that the bullets and casings recovered from the shooting were fired from the weapon recovered from Norris.

Norris testified that Golden came to her home in the evening of June 22, introduced the person with her as "Eddie," and said that she had come for "the piece" she had left there previously. After retrieving the gun, Golden and Eddie left. Golden returned the gun later, but came back for it again the next evening, June 23. At that time she was accompanied by Eddie and another person whom Norris did not see. Golden brought the gun back again later that night.

Defendant was placed in a lineup a few hours after he had given his written statement, on the afternoon of June 26, 1987. As noted earlier, Louia and LaChina viewed the lineup separately; both identified defendant as the person who shot Valerie.

In addition to the weapon evidence, the State introduced fingerprint evidence and the testimony of an expert who identified defendant's fingerprints on lifts taken from the "T-top" of Smith's car, the interior passenger window, and a Coke can found on the rear floor of the car. Smith's and Golden's fingerprints were also found on various parts of the interior and exterior of the car.

At the outset of his testimony, defendant acknowledged that in August 1983, he pleaded guilty to voluntary manslaughter and was sentenced to 10 years in

prison. He was paroled on March 3, 1987. Thereafter, he and a former girlfriend, Evelyn Miller, resumed their relationship and, in May 1987, he moved in with her and her two children. Defendant denied any involvement in Valerie's murder. He also denied that his custodial confessions were voluntary, asserting that the statements were the product of police threats and abuse, and an extended lack of sleep.

Defendant also testified that on June 21, 1987, Golden came into a lounge where he, Miller and other friends were celebrating Father's Day. He knew Golden because he had dated her sister. Golden bought him a drink and then invited him outside to smoke a joint. They walked to Golden's car, where Golden introduced him to Smith, who was in the front passenger's seat. He leaned down from outside the driver's window and said "hello," but otherwise conversed only with Golden. After approximately 10 minutes, Golden left and he rejoined his friends inside the lounge. The next time defendant saw Golden was later that week when they both appeared before a judge.

Defendant was found guilty of the murder of Valerie McDonald and sentenced to death. Defendant raises 29 general issues and numerous subsidiary issues for our review. Thus, additional facts will be incorporated into our discussion of those issues to which they are relevant.

### Pretrial Suppression Hearing

Defendant has not pursued his pretrial contention that his inculpatory statements should have been suppressed as involuntarily made. He continues to maintain, however, that his statements should have been suppressed because they were the fruit of an unlawful warrantless arrest inside his home.

Hearings were conducted on defendant's motions to quash his arrest and to suppress his statements. Several

police officers, including Detectives Kaminski, Mannion, Richter, Gildea and Jin testified regarding defendant's arrest both at the hearings and at trial. Theresa Williams, who owned the house where defendant was staying, and Evelyn Miller, defendant's girlfriend, also testified concerning defendant's arrest at the pretrial hearing and at trial. A composite of those witnesses' testimony is as follows.

After obtaining a description of the offender from witnesses on the scene and questioning Smith, police officers took Golden into custody. Confronted with her failure of a polygraph examination, Golden made a statement implicating herself and defendant in Valerie's murder.

According to Detective Kaminski, Golden related that Smith was angry that Louia had decided to end their relationship. In conversations on June 21, and June 23, 1987, Smith told Golden that she wished Valerie were dead and asked Golden if she knew anybody who could "do it." Golden responded that she did, but that it would cost $500, which Smith agreed to pay. Smith and Golden drove to a lounge near 59th and Honore Streets. Golden approached a man whom she knew only as "Eddie" and told him that the woman in the car (Smith) wanted somebody "hit" and was willing to pay $500. Eddie accepted the offer and agreed to give Golden $100 from Smith's payment to him.

Smith, Golden and Eddie drove to the home of Golden's cousin Tippy, where Golden obtained a gun. After taking Smith home, Golden and Eddie drove to the apartment building where Valerie McDonald and her family lived. They left when they saw that Louia's car was not there. They returned the gun to Tippy and agreed to meet again the next day. The following evening they picked up the gun, drove past the McDonalds' residence and then parked the car a short distance

away. Golden pointed out the McDonalds' car as it passed. Eddie then exited the car. Sometime later he ran back and, in response to Golden's inquiry, said "I shot her in the head. I think she's dead." They then drove to Smith's house, where Eddie was paid $500, from which he gave Golden $100.

Detective Kaminski testified that Golden told him that she did not know the address of the house where Eddie was staying, but that she would be able to direct the detectives to it. Shortly after midnight on June 25, she and seven detectives drove, in three cars, from Area 6 on the north side of Chicago to a house on South Wolcott Avenue. A middle-aged man and woman, who stated that they were Eddie's aunt and uncle, advised the police that Eddie was not there. Detectives Mannion and Jin remained there while the other detectives and Golden proceeded to a house a few blocks away on South Honore Avenue. Detectives Richter, Gildea and Johnson approached the front door; Kaminski went to the rear of the house. All the officers had their weapons drawn; Richter was armed with a shotgun. Richter's knock on the front door was answered by a woman named Theresa. When Richter asked if Eddie was there, Theresa opened the door, allowed the officers to enter the foyer, and told them that Eddie was downstairs with his girlfriend. Theresa led them through the house to a rear door leading down to the basement. Theresa pointed to a room with a partially open door at the front of the basement from which some light was emanating. The officers did not notice any furnishings as they walked through the basement. Richter looked in the room and saw that the man in the bed fit the description of the offender. When Richter asked, "Are you Eddie?" the man responded that he was. Richter ordered defendant out of bed and advised him that he was under arrest. Defendant, wearing only undershorts, was

ordered to his knees and handcuffed. The woman in the room with defendant (Evelyn Miller) handed one of the detectives some clothing before defendant was taken out of the house. Defendant was placed in a squad car and driven away from the house, where bystanders had gathered. The police stopped the car a few blocks away and allowed defendant to put on his clothing.

Theresa Williams (not related to defendant) testified that at approximately 1 a.m., her brother Ronald woke her and her boyfriend, Dwight, by calling out and knocking on their bedroom door. When she came out, police officers were standing on each side of the door with their guns pointed toward her. She did not know how the police gained entry into the house. When Dwight came out of the bedroom, an officer said, "He's not the guy." Williams asked who they were looking for and told them she had a basement tenant who had a boyfriend staying with her. The officers instructed her to take them downstairs. She had to unlock the bottom basement door to enter the basement; as she did, the police pushed her inside. Williams called out for Miller, but Miller did not answer. Williams knocked on the bedroom door and announced that the police were there to see Eddie. When the light went on the police again pushed her through the door first. They followed her into the room with their guns drawn and said, "Get up right now Eddie Williams." An officer took a photograph from Miller's mirror and searched under the mattress while defendant was being handcuffed. Defendant was then taken out the back door in his undershorts.

On cross-examination, Theresa Williams stated that the police asked if they could go downstairs to see Miller's boyfriend, and that she gave her permission. Williams also stated that the basement contained several pieces of Miller's furniture, including bunk beds where Miller's two children were sleeping. The children

awoke when Miller began screaming at the police officers.

Evelyn Miller testified that she and defendant were asleep when Theresa Williams knocked on the door and said that some police officers wanted to see Eddie. As soon as she reached up and turned on the light, two police officers came in with their guns drawn. They asked defendant if he was Eddie Williams; defendant said that he was. The officers ordered defendant out of bed and onto his knees. Miller was not allowed to get out of bed. The officers searched under her mattress, asking, "Where's the gun?" They also took a photograph of defendant from her mirror. As the officers were leaving, Miller asked where they were taking defendant so that she could bring him some clothes. She later went to Area 6 and gave an officer there some clothes for defendant. Theresa Williams had given defendant permission to move in with Miller, and he had contributed some money for the rent. The remainder of Miller's cross-examination is the subject of a separate issue and will be discussed later in this opinion.

Although defendant did not testify at the suppression hearings, his testimony at trial included an account of his arrest. Defendant testified that when Miller turned on the light in their room, he awoke and saw several police officers with their guns drawn. They ordered him to get out of bed. He repeatedly asked them what he had done. They responded that he knew what he had done and to "just shut up." The officers ordered him onto his knees, pushed his face on the floor and, while pointing a gun to the back of his head, handcuffed him. He requested but was not permitted to put on his clothes. He was led out to a squad car and transported to the police station, where he was handcuffed in an interview room. Many hours later, as a result of some "smacks" and threats by Mannion and a lack of sleep,

defendant began agreeing to the version of events recounted to him by Detective Mannion and Assistant State's Attorney DeGrazia. Eventually he signed the statement that DeGrazia had composed in advance and brought into the interview room with him.

The trial court denied defendant's motion to quash his warrantless arrest. In its ruling, the court found that the police acted reasonably, that they had probable cause to arrest defendant, that exigent circumstances were present, and that there was no forced entry. The court also denied defendant's motion to suppress his statements as having been illegally procured and involuntarily given.

Defendant argues that his arrest at 1 a.m. by three heavily armed officers who confronted the owner of the house with their weapons drawn, ordered her to unlock the basement apartment door, burst their way into his bedroom while he was asleep, ordered him to his knees, handcuffed him and forced him to leave his house clad only in his undershorts constituted a flagrant violation of the constitutional protections against warrantless arrests inside a suspect's home. Defendant asserts that there was no exigency sufficient to countenance the officers' failure to obtain a warrant for his arrest. He maintains that the police had ample time and opportunity after obtaining information from Golden to procure an arrest warrant, and that there was no reason for the police to believe he might flee. He also argues that the number of officers involved made it possible that one officer could have obtained a warrant while the others secured the location from the outside, and that their armed entry into both the house and the basement apartment, which awakened and frightened all of the residents including two young children, was neither consensual nor peaceful.

In the absence of consent or exigent circumstances,

the police are prohibited from making a warrantless entry into a private residence to effectuate a routine felony arrest. (*Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371; *People v. Abney* (1980), 81 Ill. 2d 159, 163-74.) Factors which have been considered relevant to a determination of exigency include whether: (1) the crime under investigation was recently committed; (2) there was any deliberate or unjustified delay by the police during which time a warrant could have been obtained; (3) a grave offense was involved, particularly a crime of violence; (4) there was reasonable belief that the suspect was armed; (5) the police officers were acting on a clear showing of probable cause; (6) there was a likelihood that the suspect would escape if he was not swiftly apprehended; (7) there was strong reason to believe the suspect was in the premises; and (8) the police entry was made peaceably, albeit nonconsensually. *People v. Foskey* (1990), 136 Ill. 2d 66, 75; *People v. White* (1987), 117 Ill. 2d 194, 216-17; *People v. Yates* (1983), 98 Ill. 2d 502, 515; *Abney*, 81 Ill. 2d at 169-74.

This list is not exhaustive of the factors which may constitute exigent circumstances. The fundamental guiding principle is reasonableness, in accord with constitutional provisions governing searches and seizures. (*Foskey*, 136 Ill. 2d at 75-76; *People v. Cobb* (1983), 97 Ill. 2d 465, 484.) In determining whether the police acted reasonably, the court must look to the totality of the circumstances confronting the officers at the time the entry was made. (*Yates*, 98 Ill. 2d at 515.) The decision of the trial court on a motion to quash and suppress will not be disturbed by a reviewing court unless that decision is determined to be clearly erroneous. *White*, 117 Ill. 2d at 213.

As a preliminary matter, we take note of the parties' arguments regarding whether the police had consent to

enter the residence. The State argues that Williams gave her consent, and that defendant has not challenged on appeal the trial court's "implicit finding" of a reasonable belief by the officers that consent was granted. In reply, defendant asserts that the entry was nonconsensual and that he has not conceded otherwise, but he has not raised the issue directly because the State did not argue against his motion to quash on the lack-of-consent basis in the trial court.

This court has held that the rule of waiver, that an issue not raised in the trial court generally will not be considered on appeal, is a limitation on the parties, not on the courts, and that waiver may be disregarded by a reviewing court in order to achieve a just result. (*People v. Hoskins* (1984), 101 Ill. 2d 209, 219.) However, in the present case, we do not reach the parties' assertions of waiver on the issue of consent for two reasons. First, by denying the motion to quash on the ground that exigent circumstances justified the warrantless arrest, the trial court impliedly ruled that the entry was nonconsensual, since consent to enter a residence by the suspect or by a third party with control over the premises validates a warrantless arrest and renders unnecessary a showing of exigent circumstances. (*People v. Henderson* (1990), 142 Ill. 2d 258, 297-98.) Second, even absent a clear ruling on the issue of consent, we conclude that the trial court's finding of exigent circumstances is supported by the evidence.

The crime involved was of the most serious nature, involving unprovoked, deadly violence against the victim. From the time of the murder until defendant's arrest only 27 hours later, the police conducted an around-the-clock investigation, acting on every lead they received without delay. (See *People v. Jones* (1989), 184 Ill. App. 3d 412.) During the course of their investigation, the police learned that the car used in the offense

belonged to Smith, who led them to Golden. Golden provided the police with a detailed statement regarding the conspiracy and the shooting. Her statement was corroborated by several facts which were already known to the police, *e.g.,* the relationship between Smith and Louia, that Valerie had been shot in the head, that the getaway car was parked in a supermarket lot, and that after the shooter jumped into the car it sped away. Golden confessed to her own involvement in the crimes and implicated defendant as the gunman. Her confession, coupled with specific, independently corroborated details concerning the crimes and the gunman, constituted sufficient indicia of reliability to provide the police with probable cause to arrest defendant. See *People v. James* (1987), 118 Ill. 2d 214, 222.

Defendant's argument that, given the time lapse between Golden's statement and his arrest, the police could have obtained an arrest warrant is unpersuasive. The evidence established that Golden completed her statement at approximately 10 p.m., and that the team of officers which was thereafter assembled left Area 6 headquarters shortly after midnight. The officers clearly acted without delay in initiating efforts to apprehend defendant following receipt of information from Golden concerning defendant and his possible whereabouts. (See *Jones*, 184 Ill. App. 3d at 422 (no unjustified delay by police where arrest was made 27 hours after crime and four hours after police learned of defendant's involvement).) Additionally, Smith had been released from custody after being questioned the previous afternoon. Thus, there existed a reasonable possibility that she knew defendant's whereabouts and might alert him that Golden had been taken into custody for interrogation. (See *Cobb*, 97 Ill. 2d 465.) It was not unreasonable for the police to believe that swift action to apprehend defendant was necessary.

Further, the police were not in possession of defendant's surname or address because Golden claimed she did not have that information. They had only Golden's statement that the person they were seeking was named Eddie, and that she could show them where he was staying. Thus, the officers lacked sufficient information to obtain a warrant naming defendant and authorizing an arrest at his home. And, in fact, Golden's initial identification of the house on Wolcott Avenue as defendant's residence proved to be incorrect. It was only after the police arrived at the Wolcott location that they received additional information which led them to an address on Honore Avenue. Two detectives remained at the Wolcott residence while four others immediately proceeded to Williams' house on Honore Avenue, two blocks away. Given these circumstances, the police were justified in taking immediate action to apprehend defendant and were not required to risk defendant's flight and disappearance in the time needed to obtain a warrant.

Finally, irrespective of whether there was actual or apparent consent given for the police to enter the house, the entry was not forcible; there was no damage to any part of the building or injury to any of the occupants. That the officers entered with their guns drawn is not unreasonable since the crime was a violent, calculated murder for money, committed with a gun they had not yet recovered. The officers were justified in believing defendant was dangerous and, possibly, armed.

In sum, upon a review of the totality of the evidence, we agree with the trial court that the police had probable cause to arrest defendant and that exigent circumstances were present to justify making the arrest without a warrant. The trial court did not err in denying defendant's motions to quash his arrest and suppress his subsequent custodial statements.

## Trial Issues

Defendant contends that the prosecutor's opening statement misrepresented the strength of the State's case and thereby denied him a fair trial. Specifically, he argues that the prosecutor misled the jury to believe that the McDonalds' younger daughter, Lakeya, had identified defendant before trial and would identify him in court as the shooter when, in fact, at no time did she identify defendant.

The portion of the opening statement about which defendant complains concerned the moments immediately after the shooting. The prosecutor stated:

> "He [defendant] runs up to the door, peers inside. Inside is LaChina and Lou. The girls are jumping up and down. Dad, dad. Mommy's been shot. There's lights on that door. They look out the door. It's a glass door, they look at the man. They see him in the face. It's Eddie Williams. They can tell he's six foot tall, has his hair brushed back into a pony tail, slight build, gray jacket, blue jeans, t-shirt and a slight mustache."

Contrary to defendant's assertion, the prosecutor did not say that Lakeya had made a pretrial identification of defendant or "promise evidence it [the State] didn't deliver." The prosecutor's remarks were merely a compilation of what Louia and his daughters would testify that they noticed about the man who shot Valerie, and the girls' immediate reaction to the shooting. Further, the prosecutor's remarks were consistent with Lakeya's testimony that after hearing a loud noise she saw a man whose hair was in a ponytail come up to the glass door and look inside. The remarks were also consistent with Louia's testimony that Lakeya said "he shot mama." Had defense counsel felt that the jury was misled by the prosecutor's opening remarks into believing that Lakeya had previously identified defendant, defense counsel had the opportunity to cross-examine Lakeya on that point.

Additionally, there is nothing in the remarks even suggesting that Lakeya would identify defendant from the witness stand; and the prosecutor clarified in subsequent statements that only Louia and LaChina viewed and identified defendant in a lineup. These facts clearly distinguish this case from *People v. Weinger* (1981), 101 Ill. App. 3d 857, which defendant cites as analogous. In *Weinger*, the court ruled that the prosecutor's affirmative statements regarding evidence that was never produced improperly created the erroneous impression that there existed a critical piece of evidence placing defendant at the scene of the crime. The court held that the prosecutor's statements, in conjunction with more than 20 other instances of prosecutorial misconduct, caused such prejudice as to deny the defendant a fair trial. We do not believe the prosecutor's remarks in the present case misrepresented the evidence and promised nonexistent evidence so as to strengthen the State's case, or that they could have had that effect. The prosecutor's opening statement was a fair overview of what the evidence would show. See *People v. Griffin* (1992), 148 Ill. 2d 45, 55.

We next consider defendant's contention that he was denied a fair trial by the prosecutor's deliberate introduction at trial and use in closing argument of evidence of the good characters of Valerie and Louia. He maintains that such evidence served only to prejudice him in the eyes of the jury. *People v. Bernette* (1964), 30 Ill. 2d 359, 371.

Regarding Valerie, defendant argues that it was improper to elicit from LaChina and Lakeya that they and Valerie were returning home from church services immediately prior to the shooting. Defense counsel did not object to this evidence at trial or in his post-trial motion and, in fact, made references to it in his closing argument. Thus defendant cannot now complain of its

admission. (*People v. Peeples* (1993), 155 Ill. 2d 422, 475.)
Further, references to a victim's personal traits which
are only incidental to the presentation of the, State's
case do not constitute prejudicial error. (*People v.
Williams* (1991), 147 Ill. 2d 173, 229.) The evidence that
Louia had driven Valerie and her daughters back from
church was merely foundational in that it explained the
events immediately preceding the shooting, including
why the McDonald family was together in their car at
that time of the evening. This prefatory evidence was
neither presented nor argued as being material to the
State's case, and we find no prejudice to defendant as a
result of its introduction.

With respect to Louia, defendant argues that it was
improper for the State to introduce testimony that Louia
had provided support for his and Smith's young son
since the child's birth. Defendant asserts that the evi-
dence was calculated to prejudice the jury against him
by improperly depicting Louia as a man of good charac-
ter.

Once again, defendant failed to object to this
testimony at trial or in his post-trial motion and has
therefore waived any impropriety in its introduction.
(*Peeples*, 155 Ill. 2d at 475.) Moreover, there was
extensive testimony and argument at trial concerning
Louia's extramarital relationship with Smith, including
Louia's admission that he had continued his involvement
with Smith subsequent to her arrest for the murder of
his wife. Thus, we do not believe that the evidence that
Louia contributed to the financial support of his son
served to persuade the jury that Louia was a man of
high moral character. Indeed, the very fact that Louia
fathered a child in the course of an adulterous relation-
ship reflected unfavorably on his character. Further, ev-
idence that Louia was the father of Smith's child bore
on the underlying motive for the conspiracy to murder

Valerie. Finally, considering that defense counsel argued that Louia had conspired with Smith to have Valerie murdered because of his relationship with Smith, defendant can hardly be heard to complain of the State's introduction of incidental evidence regarding Louia's payment of child support for their son.

Defendant correlatively contends that the prosecutor's cross-examination of Evelyn Miller concerning defendant's employment and financial status and what, if any, monetary contributions he made toward the rent for her apartment was irrelevant and prejudicial. He argues that this line of questioning was designed only to portray him as a person without steady employment and of bad character. Defendant acknowledges the absence of any objections to this line of questioning but asserts that the prosecutor's examination rose to the level of plain error. We cannot agree.

Questions such as those asked of Miller may be improper where they have no relevance to the crime charged. (See, *e.g., People v. Redmond* (1972), 50 Ill. 2d 313, 315-16 (inquiries as to whether the defendant was "lazy and shiftless" were objectionable as concerning traits irrelevant to the crime charged—a spontaneous shooting).) In this case, however, the State's theory was that the offense was a premeditated murder-for-hire and that defendant committed it solely for financial gain. Thus, inquiries into defendant's lack of income and assets were relevant to establish a financial motive for defendant's agreement to commit the murder.

Defendant next contends that he is entitled to a new trial because the trial court committed reversible error in denying his pretrial motion to bar the State from impeaching him with evidence that he was convicted of the voluntary manslaughter of James Fortner in 1983. Defendant asserts that, in violation of the rule announced in *People v. Montgomery* (1971), 47 Ill. 2d 510,

the trial court not only failed to weigh the prejudicial effect against the probative value of the evidence but, in fact, admitted it for the very purpose that prior convictions may not be admitted, *i.e.*, to show defendant's propensity for violent criminal behavior.

Initially, we address the State's assertion, in the nature of a waiver argument, that defendant cannot now complain about the introduction of his manslaughter conviction because he used the conviction as substantive evidence of his innocence. The State points out that on direct examination of defendant concerning his custodial interrogation by the police, defendant testified: .

"I said that [the shooter] couldn't be me. I said, I just come home from the penitentiary, you know, for a manslaughter charge. I said, it would have to be stupid of me to do something like that."

We also note that defense counsel elicited from defendant at the outset of his testimony that defendant had pleaded guilty to and was then convicted of voluntary manslaughter in 1983. Defendant testified that he received a sentence of 10 years, but was paroled in March 1987.

The rule that a party cannot object on appeal to evidence which was introduced by that party does not apply where a motion to exclude the evidence was presented and denied. As this court explained in *People v. Spates* (1979), 77 Ill. 2d 193, 198-200, it is not inconsistent for a defendant to request the exclusion of evidence and, subsequent to the court's denial of that request, to disclose the evidence himself in the hope of lessening its impact upon the jury. Disclosure of evidence by a defendant in anticipation of the State's court-approved revelation of it is a matter of strategy designed to reduce the prejudicial effect of the evidence on the defendant's credibility.

Once the trial court ruled in the present case that

the State could impeach defendant with his prior conviction of voluntary manslaughter, defendant was entitled to attempt to minimize the damage of the evidence not only by introducing it himself, but also by turning it to whatever advantage might be made of it. In that regard, it is apparent from the record that defense counsel's strategy in his examination of defendant concerning the manslaughter conviction was to raise the inferences that: defendant is a person who, when guilty of wrongdoing, does not deny his guilt; and having been out of prison for only three months, defendant would not jeopardize his newly regained freedom by agreeing with near strangers to commit a murder for a mere $400. Defendant's employment of that strategy at trial does not preclude a challenge on appeal of the correctness of the trial court's adverse ruling on his exclusionary motion.

We turn then to the merits of defendant's contention. In light of defendant's arguments, we believe that a review of the origin and rationale of the *Montgomery* rule is appropriate. At issue in *Montgomery* was whether a 21-year-old conviction of robbery was admissible to impeach the defendant's credibility at his trial for the unlawful sale of narcotics. The court first recognized the fundamental evidentiary principle that only facts having logical, probative value to the issues at trial are admissible. The court determined that the defendant's prior robbery conviction was not probative of any matter relating to defendant's guilt, and that it was relevant only if one assumed that a person convicted of robbery 21 years earlier is more likely than someone without such a conviction to testify falsely in the present. The *Montgomery* court discounted that assumption as having no factual or psychological support. On the other hand, the court stated, the prejudicial effect of such evidence is "unmistakable." (*Montgomery*, 47 Ill. 2d at 514.) The

court agreed with the observation of the trial judge that, if the evidence is close, a jury is likely to convict the defendant on his past record rather than on the evidence at trial. The *Montgomery* court recognized that the customary safeguard against such danger was the giving of the instruction that a prior conviction may be considered only as it bears upon the credibility of and weight to be given a defendant's testimony. The court noted, however, the growing skepticism among legal scholars of the effectiveness of that instruction.

The *Montgomery* court then repudiated what had been the prevailing view, that a trial judge is obliged to admit past-conviction evidence, however irrelevant and prejudicial, merely because the prosecution chooses to offer it. The court reasoned that because the Illinois statute relating to witnesses provided that a prior conviction "may" be shown to impeach credibility (Ill. Rev. Stat. 1967, ch. 38, par. 155—1), the admissibility of prior-crimes evidence should be a matter within the sound discretion of the trial judge.

In this regard, the court took notice of a proposed Federal rule, a revised version of which was later adopted as Federal Rule of Evidence 609 (Fed. R. Evid. 609), concerning impeachment by evidence of prior convictions. The rule provided that for the purpose of attacking the credibility of a witness, evidence of a prior conviction is admissible only if the crime was punishable by death or imprisonment in excess of one year, or involved dishonesty or false statement regardless of the punishment unless, in either case, the judge determines that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *Montgomery*, 47 Ill. 2d at 516.

To explain the genesis and the rationale of proposed Rule 609, the *Montgomery* court quoted from the advisory committee's comments, which in turn cited the

cases of *Luck v. United States* (D.C. Cir. 1965), 348 F.2d 763, and *Gordon v. United States* (D.C. Cir. 1967), 383 F.2d 936. Interpreting a statute virtually identical to Illinois' statute, *Luck* determined that the permissive rather than mandatory language of the statute afforded the trial judge in a particular case the discretion to admit or exclude evidence of past convictions for purposes of impeachment. The *Gordon* court clarified and refined the application of *Luck*.

Writing for the *Gordon* court, then Circuit Judge Warren Burger reasoned that while some prior convictions can have genuine probative value on the issue of credibility, others, such as those which are remote in time and those which have no direct bearing on veracity, should be excluded. The *Gordon* court then announced certain guidelines for its district courts to follow in exercising their discretionary power on the admission or exclusion of prior conviction evidence. The court stated:

> "[W]e must look to the legitimate purpose of impeachment which is, of course, not to show that the accused who takes the stand is a 'bad' person but rather to show background facts which bear directly on whether jurors ought to believe him rather than other and conflicting witnesses. In common human experience, acts of deceit, fraud, cheating, or stealing, for example, are universally regarded as conduct which reflects adversely on a man's honesty and integrity. Acts of violence on the other hand, which may result from a short temper, a combative nature, extreme provocation, or other causes, generally have little or no direct bearing on honesty and veracity. A 'rule of thumb' thus should be that convictions which rest on dishonest conduct relate to credibility whereas those of violent or assaultive crimes generally do not." *Gordon*, 383 F.2d at 940.

The *Gordon* court also recognized that "[a] special and even more difficult problem arises when the prior conviction is for the same or substantially the same conduct for which the accused is on trial." (*Gordon*, 383 F.2d at 940.) As to this problem, the court stated:

"Where multiple convictions of various kinds can be shown, strong reasons arise for excluding those which are for the same crime because of the inevitable pressure on lay jurors to believe that 'if he did it before he probably did so this time.' As a general guide, those convictions which are for the same crime should be admitted sparingly ***." *Gordon*, 383 F.2d at 940.

The advisory committee comments to proposed Rule 609 cited with approval various factors suggested in *Luck* and *Gordon* as ones to be considered by trial judges in exercising their discretion, including: the nature of the prior crime, the recency or remoteness of its commission, the age and circumstances of the defendant, the extent of his criminal record, whether the crime was similar to the one charged, and the extent to which it is more important to the search for truth in a particular case for the jury to hear the defendant's story than to know of a prior conviction. The committee's comments noted that the most significant feature of Rule 609 is the requirement that evidence of a prior conviction be excluded if the trial judge determines that its probative value is outweighed by the danger of unfair prejudice.

In its conclusion, the *Montgomery* court adopted proposed Rule 609 as the rule to be applied in this State. Under *Montgomery*, the trial court must consider factors relative to the particular case before it to ensure that the danger of undue prejudice from allowing evidence of a prior conviction does not substantially outweigh the probative value of the evidence on the issue of the defendant's testimonial credibility. The *Montgomery* decision was a clear departure from previous law under which evidence of prior convictions was admissible almost without exception.

We have herein examined the origin and rationale of the *Montgomery* rule because a review of case law since *Montgomery* reveals a regression toward allowing

the State to introduce evidence of virtually all types of felony convictions for the purported reason of impeaching a testifying defendant. (See generally *People v. Kunze* (1990), 193 Ill. App. 3d 708, 728-36 (Steigmann, J., specially concurring); Spector, *Impeachment by Past Conviction: What Hath Montgomery Wrought?*, 10 Loy. U. Chi. L.J. 339 (1979).) When presented with arguments that certain felonies have no direct relation to credibility, some courts employ the rationale that a felony of any type evinces a disrespect for societal order and thus adversely affects the defendant's veracity; or, stated another way, that prior felonious conduct establishes a disposition to place self-interest ahead of the interest of society, and may suggest a willingness to do so again on the witness stand. See 10 Loy. U. Chi. L.J. at 348-51.

In our view, the increasingly mechanical application of these premises does not comport with the principles expressed in *Montgomery*, or in the authorities on which the *Montgomery* court relied in adopting Rule 609 as the rule to be applied in this State. Arguably, all criminal conduct, from the most serious felony to misdemeanors such as reckless or disorderly conduct, criminal trespass, resisting a peace officer, and numerous others, evinces a disrespect for society. The *Montgomery* rule does not, however, allow for the admission of evidence of any and all prior crimes. The focus of *Montgomery* was on crimes which bear upon the defendant's truthfulness as a witness.

Evidence of past crimes which do not relate to testimonial credibility may be admitted if they are relevant for some proper purpose other than impeachment. It is a fundamental tenet of our criminal justice system, however, that the introduction of evidence of other crimes to show or suggest a propensity to commit crime is an improper purpose and is prohibited. *(E.g., Michelson v. United States* (1948), 335 U.S. 469, 475-76, 93 L.

Ed. 168, 173-74, 69 S. Ct. 213, 218-19; *People v. Lindgren* (1980), 79 Ill. 2d 129, 137; *People v. Pruitt* (1988), 165 Ill. App. 3d 947, 951-53; *People v. Wright* (1977), 51 Ill. App. 3d 461, 462-63.) This is so because such evidence tends to persuade the jury that, on the basis of his past conduct, defendant is a probable perpetrator of the crime (*Michelson*, 335 U.S. at 475-76, 93 L. Ed. at 173-74, 69 S. Ct. at 218-19), or to influence the jurors to convict simply because they feel he is a bad person deserving of punishment (*Lindgren*, 79 Ill. 2d at 137).

In the case at bar, defendant sought to prevent the State from using his prior voluntary manslaughter conviction as impeachment evidence. The prosecutor's entire argument in support of admission of the evidence was that "defendant's criminal history is relevant. As to the voluntary manslaughter conviction, it's a felony conviction."

Without further discussion, the trial court concurred, stating:

"I think the voluntary manslaughter conviction, I have to agree with the State, that it's of great probative value in a case of this nature."

When defense counsel counterargued that evidence of the conviction was "too highly prejudicial," the trial judge responded:

"It may certainly be prejudicial, but I certainly think its highly probative of the nature of the offense."

The court's references to "a case of this nature" and "the nature of the offense" indicate that the trial judge admitted the evidence of the prior homicide conviction as being probative of the issue of defendant's guilt of the charged offense of murder, rather than as bearing upon defendant's credibility as a witness.

The State disputes that the trial court admitted the evidence as probative of defendant's propensity toward deadly violence as "entirely speculative" and "highly doubtful," but offers no other reasonable interpretation

of the court's remarks. The State's obscure suggestion that the trial judge could have been referring to any number of factors, such as that this was a capital case and a contract murder, escapes our comprehension. Moreover, the State has provided us with no insight as to the relation between the conviction and defendant's testimonial credibility. At trial, the State merely argued that defendant's criminal history was "relevant" and noted that voluntary manslaughter is a felony. On appeal, the State relies on the previously discussed argument that the conviction evinced a disrespect for societal order and thus adversely affected defendant's veracity.

We do not hold that there are no circumstances under which a voluntary manslaughter conviction may be admitted at a murder trial. However, we fail to see the relationship required by *Montgomery* between defendant's conviction and his testimonial credibility in this case. Rather, it clearly appears that the conviction was offered and admitted as relevant to the question of defendant's guilt of Valerie's murder. Such purpose contravenes the principles articulated in *Montgomery*. So long as the *Montgomery* rule remains the law in this State, we cannot countenance its further erosion.

Under the rationale of *Montgomery,* evidence of defendant's conviction of voluntary manslaughter should not have been admitted at trial. Nevertheless, having considered the record in its entirety, we cannot say that it was so prejudicial as to have denied defendant a fair trial. The State presented evidence that the descriptions given by persons who saw the assailant on the night of the offense closely matched defendant's physical appearance. Defendant was identified in lineups and in court as the man who shot Valerie. Fingerprints lifted from the interior and exterior of Smith's car matched defendant's fingerprints. The State

also introduced testimony that defendant orally confessed to the murder, and a transcription of his statement to the assistant State's Attorney was read at trial. Defendant has abandoned his pretrial claim that his statements were involuntarily given, and we have herein upheld the trial court's finding that the statements were not the fruit of an unlawful arrest. Given the overwhelming evidence of defendant's guilt, we conclude that the admission of his voluntary manslaughter conviction could not have been a material factor in his conviction such that without the evidence the verdict likely would have been different.

Defendant also contends that he is entitled to a new trial because of a series of improper questions during the prosecutor's cross-examination of him. Specifically, he argues that it was improper to ask him whether he would lie on the witness stand and whether he would tell the truth even if doing so would result in his going to prison. He maintains that this type of questioning has been condemned by the courts because it infringes upon an accused's fifth amendment right against self-incrimination. See *People v. Starks* (1983), 116 Ill. App. 3d 384; *People v. Young* (1981), 97 Ill. App. 3d 319.

The record establishes that there were no objections to the questions now being challenged. Thus, any impropriety in the questions is waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186-87.) Further, in contrast to *Starks*, where the defendant answered that he would not testify to his guilt if he had committed the crime, defendant in the case at bar responded that he would tell the truth no matter what the consequences. Thus, the risk that "a negative answer *** might demonstrate nothing more than the defendant's awareness of his fifth amendment right not to make any statement at all under such circumstances" (*Starks*, 116 Ill. App. 3d at 392) was obviated in this case. Additionally, the reversal

in *Starks* was based upon multiple instances of egregious misconduct by the prosecutor which cumulatively deprived the defendant of a fair trial.

We do not approve of this segment of the State's cross-examination of defendant. At the very least, the prosecutor's questions were improperly argumentative. (See *Young,* 97 Ill. App. 3d at 325.) However, we cannot say in this case that the questioning was so prejudicial as to rise to the level of plain error.

Defendant next contends that the trial court improperly restricted his cross-examination of LaChina regarding the critical matter of her lineup identification of him. He argues that because identification was the principal issue at trial he should have been permitted wide latitude to test the accuracy of LaChina's identification of him, and to explore matters which might have discredited her testimony.

Initially, we do not agree with defendant that this case hinged principally on identification. As noted earlier, the jury was presented with other, compelling evidence of defendant's guilt, including his own inculpatory statements. Further, rulings concerning the scope of cross-examination, like all evidentiary rulings at trial, are within the sound discretion of the trial court. Such rulings will not be disturbed absent an abuse of discretion resulting in manifest prejudice to the defendant. *People v. Boclair* (1989), 129 Ill. 2d 458, 476.

On direct examination by the State, LaChina described what she witnessed at the time of the shooting, and identified defendant in court as the offender. She also testified that she had identified him in a lineup a few days after the shooting. On cross-examination, defense counsel elicited from LaChina that Louia received a telephone call from the police on the day of the lineup and that on their way to the police station she and Louia discussed where they were going and for

what purpose. On redirect examination, the prosecutor sought to counter any impression that LaChina had been coached by Louia prior to viewing the lineup, and asked her if anyone at anytime had told her whom to pick out of the lineup, to which she responded in the negative. Defense counsel then, on re-cross-examination, sought to impeach LaChina with testimony from the hearing on the motion to suppress the lineup identification. Defense counsel asked if LaChina remembered responding "yes" to his question of whether the detectives told her they had arrested somebody who possibly may have shot her mother and that they were going to put him in a lineup. The State's objection was sustained as was the objection to defense counsel's next, slightly reworded, version of the same question.

We find no abuse of discretion in the trial court's rulings. Although circumstances may allow for the exploration on cross-examination of matters not specifically raised on direct examination, re-cross-examination is limited to responding to the testimony brought out on redirect examination. (*People v. Franklin* (1990), 135 Ill. 2d 78, 97.) Here, the questions on re-cross-examination were not impeaching of LaChina's redirect testimony and exceeded its limited scope. On redirect examination, LaChina was asked whether she had been told *whom* to identify in the lineup, not whether she was told that the police had *a* suspect in custody who would be placed in the lineup.

Moreover, we fail to see the prejudice which defendant claims resulted from the trial court's rulings. Defendant had ample opportunity during cross-examination of LaChina to inquire into all the circumstances of her lineup identification of him. Defense counsel had successfully elicited from Louia that Louia told LaChina that the police had arrested and were going to place in a lineup a man they believed

to be the offender. Also, as noted earlier, defense counsel vehemently argued to the jury that Smith had provided Louia with a description of defendant which Louia agreed to convey to the police after the shooting. Defense counsel further argued that the police later called Louia to say that they had the shooter in custody, that upon receipt of that information Louia knew that the police had arrested defendant, and that he and LaChina then drove together to view the lineup. Counsel's argument clearly implied that Louia, with foreknowledge of defendant's description, either told or suggested to LaChina whom to identify in the lineup. Considering the totality of the evidence and arguments regarding identification, it cannot be said that the point defense counsel attempted to make in re-cross-examination of LaChina was lost on the jury.

Defendant next contends that the State denied him the right to a fair trial by the prosecutors' improper remarks in closing and rebuttal arguments. Defendant cites three portions of argument which he claims violated the rules of proper argument and served to deny him a fair trial.

Defendant first argues that the prosecutor improperly argued that the jury should believe a State witness because the witness was an assistant State's Attorney by asking: "Do you think Joel DeGrazia [the assistant State's Attorney who testified to having transcribed defendant's post-arrest confession] would risk his license to practice law in the State of Illinois by so creating evidence?" Since this comment drew no objection from the defense, any impropriety in the remark has been waived. (*Enoch*, 122 Ill. 2d at 186-87.) Further, defendant testified at trial that the written statement attributed to him was actually composed by DeGrazia. Thus, the prosecutor's remark was not an unfair response to the defendant's allegation. See, *e.g.*, *People v. Collins* (1985), 106 Ill. 2d 237, 276-77.

Defendant also argues that the prosecutor improperly argued that in order to disbelieve DeGrazia the jury had to find that DeGrazia was a criminal and a felon. The complained-of statements, made in rebuttal argument, are as follows:

"[Prosecutor]: [Defense counsel] calls [DeGrazia] putty in [Detective] Mannion's hand. If you are to believe that you have to consider [DeGrazia] a fraud, a liar, and a fabricator. And in fact, suggest you have to consider him a criminal, a felon. Is that what you consider him, [defense counsel], a felon?

[Defense Counsel]: Objection, Judge.

[The Court]: Sustained.

[Prosecutor]: An obstructionist of justice?

[Defense Counsel]: Do I get to answer that, Judge?

[Prosecutor]: According to the defense, they have eyewitnessed a felony by a state's attorney, that this state's attorney has come into a courtroom and made up that story, fabricating evidence, obstructing justice. The criminal court system."

As is apparent, the prosecutor embarked on this line of argument in response to remarks made by defense counsel in his closing argument. A major theme of defense counsel's argument was that the State's witnesses had all lied and been impeached at some point in their testimony. Defense counsel specifically attacked the credibility of Detective Mannion's testimony that defendant voluntarily made inculpatory statements to Mannion at the police station. Then, with respect to the written statement which DeGrazia testified he took from defendant, defense counsel argued:

"Assistant State's Attorney DeGrazia was putty in Detective Mannion's hands. He was pure putty.

\* \* \*

Mr. DeGrazia comes in and says—first thing we know off the gitgo is, he made a mistake. This isn't just a mistake, and nothing, ladies and gentlemen—this isn't just mopery on the job, or detectives having a bad day, of the state's attorney having a mistake. This isn't about

slipshod police work. This rises quite a bit above. Quite a bit above."

As noted above, it was defendant's testimony and defense counsel's argument that defendant did not make the statement attributed to him by Mannion and De-Grazia, but, rather, that DeGrazia prepared the statement himself and then made corrections to it to make it appear that defendant had both made and proofread the statement before signing it.

The remarks were not a misstatement of the law and were invited by the defense argument that Mannion and DeGrazia not only lied about defendant's making any inculpatory statements, but that DeGrazia, at the behest of Mannion, had actually prepared a fabricated written confession. The remarks of both counsel in their arguments merely reflected and offset each side's position as to the credibility of the other's case theory. We do not believe defendant was prejudiced in this regard. See, *e.g., Collins*, 106 Ill. 2d at 276-77.

Defendant's third allegation of argumentative misconduct by the prosecutor is that the prosecutor improperly appealed to the jurors to align themselves with the victim. The prosecutor concluded his rebuttal argument by stating:

"I ask you and all of us not to lose sight of Valerie. She was a victim more than once. She was the victim of perhaps a bad marriage. She was certainly the victim of a brutal murder, and I ask you now, please, don't make Valerie a victim a third time by a miscarriage of justice."

By failing to object to this closing remark defendant has waived any claim of error. (*Enoch*, 122 Ill. 2d at 186-87.) Moreover, since Louia McDonald's adulterous relationship with Smith was a central matter in the case, and since Valerie's murder was a brutal act, we do not believe that this brief closing comment requesting that Valerie's murder not go unavenged was so inflammatory or prejudicial as to warrant reversal of defendant's convictions.

Defendant also contends that he was denied his sixth amendment right to present an effective closing argument when the trial court erroneously sustained an objection to proper argument and cautioned defense counsel to not misstate the law. Defendant argues that the court wrongfully sustained an objection when defense counsel "rhetorically pointed a finger of guilt at Louia" based on the continuation of his adulterous affair with Smith despite the State's theory that Smith had hired someone to kill Louia's wife. Defendant asserts that it was proper argument to suggest that Louia was involved in Valerie's death and that he therefore had a motive to falsely identify defendant as her killer.

The portion of defense counsel's argument at issue is as follows.

"The State asked him, 'Did you have an affair with Geraldine Smith? Yeah. How long did you have that affair with Geraldine? Answer. Up to from either, from the time, up until now.' Until now.

When I asked him on cross-examination, you still seeing Geraldine? Yes. That's ludicrous. That's ridiculous. A woman who is charged, in the State's theory of the case, with hiring somebody to kill your wife and the mother of your kids, you are having an affair before and you're having an affair now, as we stand here now?

Eddie Williams shouldn't be sitting there, Louia McDonald should be sitting there. And, ladies and gentlemen, if any one of you believe that, you must find Eddie Williams not guilty."

[Prosecutor]: Objection.

[The Court]: Sustained.

[Defense counsel]: You must find Eddie Williams not guilty.

[Prosecutor]: Object.

[The Court]: Well, I don't know what he's going on to say here now. Let's not misquote the law, [defense counsel]."

Defendant argues that "[a]n accused may attempt to show or suggest any fact or circumstance tending to

show that someone else committed the crime" with which he is charged (*People v. Nitti* (1924), 312 Ill. 73; *People v. Wilson* (1986), 149 Ill. App. 3d 293), and that while defense counsel's remarks were, "perhaps, hyperbolic," counsel "should have been allowed to argue that the jury consider whether the wrong person sat in defendant's chair."

In the cases cited by defendant, the defense counsel attempted to prove that someone other than the defendants committed the crimes through the introduction of evidence at trial, not by way of closing argument. Closing arguments are not themselves evidence (*People v. Henderson* (1990), 142 Ill. 2d 258, 325) and must be based on trial evidence or legitimate inferences therefrom (*People v. Morgan* (1991), 142 Ill. 2d 410, 463).

The record before us contains no evidence that Louia conspired with Smith to have Valerie murdered. However, even, assuming *arguendo* that Louia was involved in the conspiracy, the evidence presented refutes any suggestion that he was the gunman. Thus, if counsel's argument was intended to imply that Louia, rather than defendant, was Valerie's killer, it was improper as having no basis in the evidence. If the argument was meant as an advisement that defendant could not be found guilty if Louia had any type of involvement in the conspiracy to murder Valerie, it was a misstatement of the law. The trial court correctly sustained the State's objection to the argument and, being uncertain what counsel's next remark would be, properly cautioned him to not misstate the law.

Moreover, a review of counsel's entire closing argument reveals that counsel was not precluded from vigorously arguing that Louia had plotted with Smith to make defendant the "patsy" and the "fall guy" in the murder of Louia's wife by having Louia falsely give the police a description of defendant and later identify him

as the offender. Thus, we are convinced that counsel's theory of defense was clearly apparent to the jury. See, e.g., *People v. Harris* (1989), 132 Ill. 2d 366, 390-91.

Defendant's final trial-related contention is that the trial judge erred in giving, over his objection, an instruction on accountability where there had been no evidence presented to support that theory of guilt. It is defendant's position that the unwarranted instruction had the effect of lessening the State's burden of proof.

Defendant argues that the settled rule is that where all of the evidence establishes that a defendant is either guilty as the principal or not guilty, it is error to instruct the jury on accountability. (*E.g., People v. Lusietto* (1976), 41 Ill. App. 3d 205.) Defendant points out that he was charged with conspiracy to commit murder and with murder, and that the indictment specifically alleged, and the State's theory had consistently been, that it was he who shot and killed Valerie McDonald. His defense to those charges was that he did not conspire with Smith and Golden, and that he was misidentified as the shooter. Thus, he maintains, based upon the charges, the State's theory, and the evidence, the jury had to find that he had conspired with Smith and Golden to kill Valerie and that he was the triggerman, or that he was not guilty. He claims that the inclusion of an accountability instruction on the charge of murder created the risk of jury confusion on these issues and, more importantly, relieved the State of proving beyond a reasonable doubt that he was the actual shooter.

The State responds that "the record below is replete with evidence that defendant aided and abetted Smith and Golden in the murder," and that the evidence showing that "other than defendant's agreeing to [commit the crime] and then actually pulling the trigger," all of the planning of and preparations for the murder were done by Smith and Golden. The State

argues that this evidence, and the fact that Golden drove the getaway car, justified the giving of an accountability instruction.

The argument of the State is misguided. While the above evidence would support the giving of an accountability instruction in a murder trial against Golden or Smith, we fail to see how the evidence justifies an accountability instruction in defendant's trial. The State's argument, as we understand it, confuses the legal concepts of conspiracy and accountability by proposing that the evidence which established that defendant conspired with Smith and Golden to commit murder also supported the theory that defendant was guilty of murder by accountability. However, as the State otherwise strenuously argues, its allegations and the totality of its evidence against defendant were that he was the actual shooter. There was no evidence to support the theory that defendant acted as an accomplice to, in addition to acting as a co-conspirator in, the murder of Valerie. Thus, there was no basis for an accountability instruction. See *Lusietto*, 41 Ill. App. 3d at 207 ("guilt predicated on an accountability theory is proper only if the other evidence is inconclusive as to defendant's direct participation in the crime").

However, we conclude that the jury could not have convicted defendant on the theory that he was guilty of murder by reason of accountability for the actions of others. As discussed above, the entirety of the State's case was that defendant alone shot and killed Valerie. The defense theory was that defendant did not participate in the crimes at all but, rather, was misidentified as part of a plot to "set him up." On the basis of the evidence presented, the jury could reach only one of two conclusions: that it was defendant who shot and killed Valerie and was therefore guilty as the principal, or that he was not guilty. The giving of the accountability

instruction in this case was, therefore, harmless error. See *People v. Jefferson* (1992), 227 Ill. App. 3d 491, 496-97 (and authorities cited therein).

In conclusion, we believe that defendant received a fair trial at which there was compelling evidence of his guilt. We have reviewed the errors and improprieties alleged by defendant and we are satisfied that no reversible error occurred in the trial proceedings. Accordingly, defendant's convictions for conspiracy to commit murder and murder are affirmed.

### Sentencing Issues

Defendant contends that he is entitled to reversal of his death sentence and remandment for a new sentencing hearing because of the constitutionally improper exclusion of four prospective jurors on the basis of their views toward capital punishment. One of the prospective jurors was excused for cause by the trial court. The State exercised peremptory challenges against the other three venirepersons whose exclusions defendant challenges.

Defendant first asserts that William Casey was improperly excused for cause, in violation of *Witherspoon v. Illinois* (1968), 391 U.S. 510, 522-23, 20 L. Ed. 2d 776, 784-85, 88 S. Ct. 1770, 1777-78, simply because he expressed scruples against the death penalty. The relevant portion of the examination of Casey by the trial court is as follows:

"Q. Do you have any scruples or strong feelings by reason of religion or conscience against the death penalty?

A. I am against the death penalty.

Q. Do these scruples—Do you have these scruples against the death penalty no matter what the particular facts of the case might be?

A. I've never been put in that position. My thinking is that I am against the death penalty.

Q. Would your scruples about the death penalty interfere with or affect your ability to determine guilty or innocence in accordance with the evidence and the law?

A. No, I don't think so.

Q. If the defendant is found guilty of the charges before the court could you consider all the possible penalties available under state law, including the death penalty?

A. Yes.

Q. With [*sic*] your scruples prevent you from considering the death penalty in the appropriate case?

A. Well I am against the death penalty.

Q. Would you automatically vote against the death penalty?

A. Again, I've never been put in a position that I had to vote, so I really can't honestly answer that.

Q. But you feel you are against the death penalty?

A. Yes.

Q. Period?

A. That's what I mean, yes.

THE COURT: Thank you, sir. You are excused."

The court in *People v. Seuffer* (1991), 144 Ill. 2d 482, on which defendant primarily relies, restated the holding in *Witherspoon* prohibiting the exclusion for cause of prospective jurors who express only general objections to the death penalty on moral or religious grounds. As the *Seuffer* court also observed, under *Wainwright v. Witt* (1985), 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852, and *Adams v. Texas* (1980), 448 U.S. 38, 65 L. Ed. 2d 581, 100 S. Ct. 2521, a juror may not be excused for cause unless his views toward capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. Defendant argues that although Casey stated that he was against the death penalty, his other responses indicated both that his beliefs would not affect his ability to fairly decide guilt or innocence and to consider all penalties, including the death sentence, in the event of a conviction; thus, he met the standard for jury service under *Witherspoon* and *Wainwright*.

This court is bound by and has consistently applied

the standards enunciated in *Witherspoon, Wainwright* and *Adams* and restated in *Seuffer*. Application of those standards, however, necessarily rests upon the *voir dire* dialogue in each case. This is so because no two cases are likely to involve identical questions and answers concerning venirepersons' views toward capital punishment and their ability, or lack thereof, to vote for a sentence of death in a given case. A great deal of deference must be given the trial judge, who is in a superior position to determine from a prospective juror's responses as a whole and the juror's demeanor whether that individual's views toward capital punishment would substantially prevent or impair the performance of his duties as a juror at the sentencing phase of the trial in accordance with the oath he is required to take. (*People v. Morgan* (1991), 142 Ill. 2d 410, 437-38.) In making that determination the prospective juror's remarks must be considered not in isolation but as a whole (*People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 387), and it must be clear that the juror is willing to set aside his own beliefs in deference to the rule of law (*Lockhart v. McCree* (1986), 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149-50, 106 S. Ct. 1758, 1766; *Pitsonbarger*, 142 Ill. 2d at 386).

In *Seuffer*, the prospective juror at issue initially expressed "philosophic and medical" but not religious or conscientious scruples against capital punishment. Upon further questioning, however, he stated unequivocally that his scruples would not prevent him from considering the death penalty or cause him to automatically vote against it. The court thus held that the juror did not express a disqualifying view under *Witt* and *Adams*, and that his erroneous exclusion necessitated a new sentencing hearing. *Seuffer*, 144 Ill. 2d at 504-08.

*Seuffer* is distinguishable from the case at bar. As in *Seuffer*, venireman Casey said that his scruples against the death penalty would not interfere with his ability to

determine guilt or innocence, and that he could consider all penalties, including the death penalty. However, he also unequivocally stated three times that he was against the death penalty. He could not say with certainty whether he would automatically vote against it, but neither did he state that he would be willing to temporarily put aside his own beliefs in deference to the law. Rather, in response to the trial judge's additional inquiries of whether he was against the death penalty, "period," Casey responded "Yes" and "That's what I mean, yes." Casey's responses, taken as a whole, reveal that his objection to capital punishment would substantially impair the performance of his duties as a juror, in accordance with the instructions and his oath, at the sentencing phase of trial. The excusal of venireman Casey for cause did not violate the precepts of *Witherspoon* and *Wainwright*.

Defendant also contends that his death sentence should be vacated because the State exercised peremptory challenges to exclude three prospective jurors who, while not excusable for cause, expressed conscientious and/or religious scruples against capital punishment. Defendant argues that by use of those peremptory challenges, the State indirectly obtained a jury which it was precluded from obtaining through the use of challenges for cause. Defendant acknowledges that the argument he advances has previously been rejected by this court in *People v. Stewart* (1984), 104 Ill. 2d 463, 481-82, but asks us to "revisit the issue" in the aftermath of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, which, defendant argues, held that peremptory challenges are no longer unassailable and may not be used for unconstitutional purposes.

However, this court has already addressed and rejected defendant's "post-Batson" argument in *People v. Howard* (1991), 147 Ill. 2d 103, 136-38. The court in

*Howard*, noting, *inter alia*, Justice O'Connor's remarks in *Brown v. North Carolina* (1986), 479 U.S. 940, 942, 93 L. Ed. 2d 373, 375, 107 S. Ct. 423, 424 (concurring in the denial of *certiorari* in a case involving the use of peremptory challenges of jurors based upon their viewpoints toward capital punishment), held that the *Batson* decision, relating to peremptory challenges of venirepersons on account of their race, does not extend to forbid the practice of excusing potential jurors because of their reservations regarding capital punishment. We see no reason to depart from the reasoning and decision in *Howard*.

Constitutionality of the Illinois Death Penalty Scheme

Defendant poses several challenges to the constitutionality of the Illinois death penalty statute and the procedures employed at the capital sentencing hearing. Defendant recognizes that each of the arguments he makes has been previously considered and rejected by this court. He nevertheless requests that we revisit the issues and reconsider this court's prior holdings.

Defendant first contends that he was denied a fair sentencing hearing because the State was allowed to deliver both opening and rebuttal closing arguments at the conclusion of the second phase of the hearing. This court has determined that this procedure is proper because, as the moving party, the State "bear[s] the affirmative of the issue" (*People v. Ramirez* (1983), 98 Ill. 2d 439, 469), *viz.*, of producing evidence of aggravating factors and persuading the jury that there were not sufficient factors presented in mitigation to preclude the imposition of the death penalty. The State is therefore entitled to present both opening and rebuttal arguments. *Ramirez*, 98 Ill. 2d at 468-69; see also *People v. Bean* (1990), 137 Ill. 2d 65, 138-40.

Defendant next argues that the death penalty statute is unconstitutional because it vests the prosecutor

with unguided discretion to request the death sentence hearing in a particular case, and therefore results in the arbitrary and capricious imposition of the death penalty. This contention and various arguments offered in support of it were analyzed in depth in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 534-43. The *Cousins* court ruled that the death penalty statute was not invalid for the discretion it accords the prosecutor to decide whether to seek the death penalty in a particular case. See also *People v. Page* (1993), 155 Ill. 2d 232, 283; *Silagy v. Peters* (7th Cir. 1990), 905 F.2d 986, 990-94.

Defendant also challenges the constitutionality of the death penalty on the basis that it places upon defendant the risk of nonpersuasion on the issue of whether the death penalty should be imposed. The court in *Bean*, 137 Ill. 2d at 138-40, discussed this issue and concluded that the Illinois death penalty statute does not unconstitutionally impose on the defendant the burden of persuading the jury to not impose the death sentence. The *Bean* court observed that the second phase of the sentencing hearing is a weighing process in which the defendant alone does not bear the burden of persuasion. Once the State has met its burden of proving defendant eligible for the death sentence and has offered evidence of aggravating factors, defendant may then attempt to persuade the jury that it should not be imposed due to the existence of mitigating factors. Thus, both parties bear a burden of persuasion. See also *Ramirez*, 98 Ill. 2d at 469; *Free v. Peters* (7th Cir. 1993), 12 F.3d 700, 703.

Defendant's final challenge to the constitutionality of the death penalty statute is that it fails to provide any procedure sufficient to ensure adequate appellate review. This issue was considered and rejected in *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44. The *Brownell* court held that our appellate review procedures are

sufficient to insure that the death penalty is not being imposed arbitrarily or capriciously. See also *Howard*, 147 Ill. 2d at 171-72.

Defendant has presented no persuasive arguments as to why we should reconsider our previous determinations on these challenges to the constitutionality of the death penalty statute and the procedures employed at capital sentencing hearings. Accordingly, we continue to adhere to our prior holdings on these issues.

In a supplemental brief, defendant also contends that we should vacate his death sentence and order a new sentencing hearing based upon the reasoning in *United States ex rel. Free v. Peters* (N.D. Ill. 1992), 806 F. Supp. 705, wherein a Federal district court judge determined that certain of the Illinois death penalty instructions given at the sentencing hearing of defendant Free were so confusing as to be constitutionally defective. In rendering its decision the court was persuaded by a study, conducted by the late Hanz Zeisel, a professor of law and sociology, which tested the ability of persons who participated in the study to comprehend certain death penalty instructions. The study showed a significant level of misunderstanding and confusion, particularly with regard to the following: whether the jury could consider mitigating factors other than those listed in the statute and/or by the trial judge; who bears the burden of persuasion during the second phase of the hearing, and what the nature of that burden is; whether the jury must unanimously agree on the existence of a mitigating factor before any juror can give weight to that factor; and the consequences of a deadlock on whether the death sentence should be imposed. The district court concluded that the Illinois death penalty instructions permit the unguided and arbitrary imposition of the death sentence in violation of the eighth and fourteenth amendments. (See *Boyde v. California* (1990),

494 U.S. 370, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (an instruction is constitutionally defective if there is a reasonable likelihood that it misled the jury into sentencing the defendant to death).) Although the court found that the arguments of counsel cured the confusion in two of the instructions, it held that two others resulted in the unconstitutional imposition of Free's death sentence.

Defendant argues that the instructions given at his sentencing hearing suffered the same constitutional infirmity and were not cured by counsel's arguments. He thus argues that his death sentence was unconstitutionally imposed and urges us to adopt the reasoning in *Free* and declare the death penalty instructions invalid as applied to his case.

Initially, because lower Federal courts have no appellate jurisdiction over State courts, decisions of lower Federal courts on Federal constitutional questions are not binding on State courts. (*People v. Kokoraleis* (1989), 132 Ill. 2d 235, 293-94.) Moreover, previous decisions of this court have agreed with the court of appeals in *Gacy v. Welborn* (7th Cir. 1993), 994 F.2d 305, which rejected the argument that the Zeisel study justified overturning earlier decisions upholding the constitutional validity of the death penalty instructions. Further, the *Free* decision on which defendant specifically relies was recently reversed by another panel of the Seventh Circuit Court of Appeals in *Free v. Peters* (7th Cir. 1993), 12 F.3d 700. The appeals court held, *inter alia*, that the Zeisel study was fatally flawed in its methodology. We are in agreement with that court's determination that the Zeisel study does not provide a basis for invalidating the Illinois death penalty instructions. See *People v. Kokoraleis* (1994), 159 Ill. 2d 325; *People v. Kitchen* (1994), 159 Ill. 2d 1.

In sum, we reject defendant's claims that his death sentence should be vacated because the death penalty

statute, proceedings and instructions are unconstitutional. However, we hold, on other grounds, that defendant is entitled to a new sentencing hearing.

## Eligibility Phase

Defendant first contends that the prosecutor's opening argument at the conclusion of the eligibility phase of his sentencing hearing contained irrelevant and inflammatory remarks which denied him a fair hearing. The specific portion of the argument about which defendant complains is as follows:

"[J]ustice in this case requires that the defendant be stopped. Justice in this case requires that this type of act be deterred, that others be deterred from commiting [*sic*] this type of act. Justice requires that the punishment fit the crime."

The State responds that defendant has waived this issue by failing to object to the comments at trial. (*Enoch*, 122 Ill. 2d at 186.) The State also argues that justice is no less a proper matter during the eligibility phase of the sentencing hearing than it is at trial or during the aggravation and mitigation stage, and that defendant has failed to cite to any authority for the proposition that it was improper to ask the jury to stop the defendant and to deter others by administering justice.

Contrary to the State's position, this court has stated in the past that a high degree of procedural accuracy is required in determining whether the death sentence is to be imposed (*People v. Hope* (1986), 116 Ill. 2d 265, 274). During the first stage of the sentencing hearing, the only question for the jury to determine is whether, on the basis of proof beyond a reasonable doubt that the defendant was at least 18 years of age at the time of the offense and of the existence of a statutory aggravating factor, the defendant is *eligible* to receive the death penalty. The question is not whether he *should* receive it. *People v. Davis* (1983), 97 Ill. 2d 1, 26.

We agree that the prosecutor's remarks were improper. Indeed, her brief argument focused almost entirely on matters not relevant to the narrow issue for consideration by the jury at that stage of the sentencing proceeding. In addition to the above-quoted comments, the prosecutor asked the jury to find defendant eligible for the death sentence "because in certain cases the death penalty is essential to the support of our social order," and because "society has the right to have the defendant found eligible for the death sentence." This argument incorrectly directed the jury to consider matters beyond the limited scope of its task at that point in the proceedings of determining defendant's statutory eligibility to be sentenced to death. See *People v. Adams* (1985), 109 Ill. 2d 102, 124-26 (remarks which were irrelevant to the issue of defendant's eligibility for the death penalty may have improperly distracted and influenced the jurors).

We disagree, however, with defendant's correlative argument that the trial court improperly restricted his closing argument at the first stage of sentencing. Defense counsel attempted to counter the prosecutor's remarks that the jurors should find defendant eligible for the death sentence to deter others from committing this type of crime by arguing that capital punishment has not been shown to be a deterrent. Counsel also entreated the jurors to not themselves become killers but to permit defendant to spend the rest of his life in prison. The prosecutor's objections to these comments, on the ground that they were irrelevant to the limited question of defendant's eligibility for the death sentence, were sustained. In a sidebar, defense counsel argued that the prosecutor had "opened up" the subject by her improper argument. The trial court remarked that the parties were "even," and directed counsel to desist from any further such argument.

For the reasons discussed, the judge correctly ruled that defense counsel's comments exceeded the proper scope on the eligibility issue. The court's rulings also indicate that, had defendant interposed objections to the State's improper argument, they would have been sustained. Defendant's inaction enabled the prosecutor to proceed with her theme. The prosecutor acted improperly in proffering nonstatutory and irrelevant reasons why the jury should find defendant eligible for the death penalty. Nevertheless, defense counsel was not entitled to make similarly inappropriate arguments.

### Aggravation and Mitigation Phase

Defendant contends that he was also denied his right to a fair sentencing hearing by numerous instances of error and prosecutorial misconduct during the aggravation and mitigation phase of the sentencing hearing. Defendant cites as error the introduction of certain aggravation evidence and the preclusion of certain mitigation evidence and argument. He also argues that the prosecutor's argument misstated the evidence and the law and was improper and inflammatory. Defendant maintains that these errors and arguments were so prejudicial as to require that he be given a new sentencing hearing.

Defendant alleges three instances of erroneously admitted testimony in aggravation concerning acts of criminality and misconduct by defendant prior to the instant offense. Initially, we note that the Illinois death penalty statute permits the introduction at the second phase of the sentencing hearing of evidence which ordinarily would not be admissible during the guilt phase of trial. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(e); *People v. Tenner* (1993), 157 Ill. 2d 341, 380-81.) This is so because, in determining the appropriate penalty, the sentencer must possess the fullest information possible concerning defendant's life, character, and criminal rec-

ord. (*People v. Brisbon* (1989), 129 Ill. 2d 200, 218-19.) Evidence is admissible if it is relevant and reliable, the evaluation of which lies within the discretion of the trial court. *Tenner*, 157 Ill. 2d at 380-81.

Defendant first complains of the testimony of Chicago Police Officer Brian Lyons that, in 1978, he responded to a call of a battery at defendant's residence. A woman named Bridget Williams told Lyons that defendant had struck her in the face with his fist several times. Defendant was arrested but Lyons could not recall whether he had ever gone to court regarding the matter. Defendant argues that Lyons' testimony is insufficient proof of any wrongdoing because it was uncorroborated, the case was stricken with leave to reinstate, and no prosecution or conviction resulted.

We cannot say that the trial court abused its discretion in admitting Lyons' testimony. Officer Lyons personally spoke to the complainant in that incident and, as a result, placed defendant under arrest. During cross-examination of Lyons, defendant did not challenge Lyons' testimony as to the occurrence of the incident, but rather sought to imply through counsel's questions that it was a minor domestic dispute. Further, the jury was made aware that defendant received no criminal penalty in connection with this incident. The evidence was sufficiently relevant and reliable and its hearsay nature did not bar its admission. See *Tenner*, 157 Ill. 2d at 380-81.

Similarly, we find no error in the admission of the testimony of Officer George Hardison. Hardison testified that in November of 1981, he responded to a call of a battery on South Albany Avenue in Chicago. Upon his arrival there, he met with James Fortner. Fortner was visibly injured: his left eye was swollen and almost shut, his nose was bleeding and he had bruises on the side of his jaw. Fortner reported that during a verbal alterca-

tion, his stepson, Kiwanis Moore, and defendant began to beat him about the face. In self-defense, he picked up a hammer and struck out at them. Fortner believed he may have struck defendant with the hammer. Sometime later, Hardison received a call of a battery victim at Mt. Sinai Hospital. When he arrived, a nurse told him that a patient named Eddie Williams reported to her that he had been struck with a hammer. Hardison met with defendant, advised him of his *Miranda* rights and asked about the cause of his injury. Defendant told Hardison that he hurt his head in an accident. Following defendant's treatment and release from the hospital, Hardison transported defendant and Moore, who had been in the hospital's waiting room, back to the Albany Avenue address. There, Fortner identified defendant and Moore as the individuals who had beaten him. Defendant was arrested, but the case was later stricken with leave to reinstate; no prosecution or conviction resulted. Defendant argues that Hardison's testimony was hearsay and failed to establish that he was the aggressor and wrongdoer, rather than the victim, in the altercation with Fortner.

The evidence at issue contrasts with that in *People v. Adams* (1985), 109 Ill. 2d 102, where the defendant was arrested near the scene of a robbery but was neither identified by the victim nor otherwise shown to be involved in the robbery. In the present case, Hardison spoke with Fortner and observed his injuries. Fortner attributed them to defendant and Moore, and advised Hardison that in the course of attempting to defend himself he may have struck defendant with the hammer. Although defendant now claims that under the facts related by Hardison, it is just as possible that Fortner was the aggressor and/or that defendant was injured while intervening between Fortner and Moore, when questioned by Hardison at the hospital, defendant stated

that he hurt his head in an accident. Further, when Hardison transported defendant and Moore back to Fortner's residence, Fortner identified Moore and defendant as the assailants. Hardison's testimony, like that of Officer Lyons, was relevant, as it reflected upon defendant's penchant for violent behavior, and, since Hardison had the opportunity to interview and observe the parties to the battery reported by Fortner, we believe it was sufficiently reliable to be admissible. (See *Tenner*, 157 Ill. 2d at 381.) That neither incident resulted in prosecution or conviction was made known to the jury and does not render the evidence inadmissible. (See *People v. Simms* (1991), 143 Ill. 2d 154, 178-79.) We cannot say that the trial court abused its discretion in allowing this evidence.

Defendant also argues that the State improperly elicited opinion testimony from a prison records officer on the gravity of a disciplinary violation by defendant while he was in prison. In testifying to defendant's disciplinary record, Officer Cameron Forbes was asked by the prosecutor whether an incident in which defendant refused to submit to a "shakedown" of his person and property was a "serious situation." Without objection by defense counsel, Forbes answered, "Yes, sir, it is. At any time inmates or staff are subject to shakedown so we maintain control of the institution. Small amounts of drugs, [and] weapons are easily secreted upon the person, and refusal to be shaken down is a very serious offense." Forbes described the sanctions defendant received as a result of the incident: the revocation of five days' good conduct credits, a 30-day C-grade demotion, which resulted in his transfer from the low-medium facility where the incident occurred to a maximum security facility, and a 15-day segregation placement.

Defendant maintains that this was improper opinion

testimony because Forbes had no personal knowledge of the incident, and that the effect of this testimony was to improperly enhance the aggravating evidence concerning his infractions of prison rules. Defendant argues that despite the lack of objection to the prosecutor's question, Forbes' response to it resulted in prejudicial error.

We note that this court has held that prison records are admissible as being reliable and as being relevant to show defendant's character, record and rehabilitative potential. (*People v. Ward* (1992), 154 Ill. 2d 272, 329.) As the records office supervisor, Forbes certainly would know what prison rule violations were serious. Although the prosecutor's question called for Forbes' opinion, considering Forbes' other testimony regarding the punishment defendant received following this incident, which included defendant's transfer from a low-medium facility to a maximum security prison and 15 days of segregation, it was apparent, even without Forbes' assessment, that the refusal to be shaken down is a serious violation of prison rules. Therefore, we cannot agree with defendant that Forbes' testimony constituted plain and reversible error.

Defendant also contends that he was denied a fair sentencing hearing by the prosecutor's use of an unnecessary, misleading and inflammatory eight-foot poster to display a list of his prior wrongdoings, arrests and convictions. A photograph of the poster is included in the record. In addition to the matters discussed above, defendant's criminal background included convictions of retail theft, criminal trespass to a vehicle and burglary. Defendant argues that the chart had no legitimate evidentiary purpose but, rather, served to unfairly and prejudicially memorialize the clear and easily understood testimony of the aggravation stage witnesses. (See *People v. Kinion* (1982), 105 Ill. App. 3d 1069, 1076-77.)

He also argues that the chart was misleading in that it portrayed incidents in his background which did not result in criminal convictions in an identical manner, and as if they were of the same significance, as offenses for which he was convicted. Defendant maintains that the State's sole motivation in its preparation and use of the chart was to inflame the jury against him, as is evinced by the prosecutor's remarks, "Look at that chart. That chart is outrageous. It's eight feet tall," during his argument regarding defendant's criminal history. Defendant claims that the prejudice was compounded when Officer Philip Mannion, one of the arresting officers and a principal State witness, was allowed to assist the prosecution in the presentation of the chart.

The State does not dispute that the poster was cumulative, but argues that the allowance of a demonstrative aid, even if it is cumulative of other evidence, is a matter within the discretion of the trial court (see *Simmons v. City of Chicago* (1983), 118 Ill. App. 3d 676, 684-85), and that in this case the court did not abuse its discretion in overruling defendant's objection to the chart. The State maintains that the information on the chart was neither inaccurate nor misleading, and that the chart was offered to make the testimonial evidence more understandable as well as to illustrate the State's theory that defendant's criminal career escalated from property crimes to violent crimes and that he failed to take advantage of numerous opportunities to rehabilitate himself. With regard to Officer Mannion's participation, the State merely opines that due to the large size of the exhibit, two persons were needed to set it up and that no prejudice could have resulted from Mannion's assistance.

Certain demonstrative aids, such as those which illustrate and thus assist the jury in understanding

testimonial evidence, may be allowed at trial. (*E.g.*, *People v. Hamilton* (1980), 80 Ill. App. 3d 794 (a blackboard on which witnesses drew certain routes they travelled).) However, an exhibit which merely summarizes clearly understandable testimony and thereby serves only to memorialize particular evidence should be disallowed. See *Kinion*, 105 Ill. App. 3d at 1076-77 (allowance of a chart summarizing the opinion testimony of an expert witness was an abuse of discretion); *Simmons*, 118 Ill. App. 3d at 684-85 (disallowance of the use of overhead slides to accompany a defense witness' testimony was a proper exercise of the court's discretion).

In the present case, evidence of defendant's criminal history was presented through certified copies of convictions and through a series of witnesses, all of whose testimony was succinct and clearly understandable. There was no legitimate need for the in-court construction of an eight-foot chart of defendant's criminal background by the taping of placards onto the chart after each witness testified. The placards restated each witness' testimony as to the date of each offense, the nature of each crime, each case number, the name of each victim, and the sentence, if any, imposed. The chart unfairly memorialized and unduly emphasized the evidence in aggravation. In contrast to *United States v. Howard* (7th Cir. 1985), 774 F.2d 838, 843-44, cited by the State, in which a chart summarizing and supplementing testimony concerning forged ballot applications was ruled allowable in a prosecution for vote fraud, the chart at issue was presented at a hearing to determine whether the defendant should be sentenced to death and as support for the State's position that he should. We cannot say that the jury's decision to impose the death sentence was not influenced by this improper exhibit and by the State's argument regarding its "outra-

geous size." We therefore hold that the presentation and use of the chart constituted prejudicial error.

We also believe that it was improper of the State to enlist the assistance of Officer Mannion in the taping of the placards onto the chart. The United States Supreme Court has ruled it to be a constitutional violation in certain circumstances for a government witness to serve in a dual role by assisting at the trial. (*Turner v. Louisiana* (1965), 379 U.S. 466, 13 L. Ed. 2d 424, 85 S. Ct. 546.) In *Turner*, two deputy sheriffs served as both principal prosecution witnesses and jury custodians. The Court reversed the conviction without a showing of actual prejudice on the basis that the witnesses' roles as officers of the court were so likely to cause the jury to give particular credence to their testimony that the defendant was deprived of his right to a fair weighing of the evidence (*Turner*, 379 U.S. at 473, 13 L. Ed. 2d at 429, 85 S. Ct. at 550). Inherent prejudice was also found in *Gonzalez v. Beto* (1972), 405 U.S. 1052, 31 L. Ed. 2d 787, 92 S. Ct. 1503, where the county sheriff served both as a key prosecution witness and as a bailiff.

The factual situation before us differs from the situations in *Turner* and *Gonzalez* because although Officer Mannion testified at length at the guilt phase he did not testify at the sentencing hearing, and his assistance at the hearing appears to have been minimal. Nevertheless, we do not condone the State's conduct in enlisting the aid of a police officer who was one of its key trial witnesses in the presentation of a prosecution exhibit.

Defendant also contends that the trial court unconstitutionally restricted his right to present mitigation evidence by precluding his mitigation witnesses from testifying that they believed he should be spared the death penalty. He argues that he was entitled to offer any evidence as a reason not to impose the death

penalty. This court has held that a witness' opinion that a defendant should not be sentenced to death is not admissible at a death penalty proceeding. (*People v. Stewart* (1984), 105 Ill. 2d 22, 67.) The decision of whether to impose the death penalty rests with the sentencing authority. Thus, while the testimony of witnesses concerning matters relating to the record and character of the defendant and the nature and circumstances of the offense are relevant to that decision, the opinions of witnesses regarding what sentence should be imposed are not. (*People v. Howard* (1991), 147 Ill. 2d 103, 162.) Such opinions are not evidence and therefore are irrelevant and inadmissible. The case of *Payne v. Tennessee* (1991), 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597, involved a dissimilar issue, and does not, as defendant asserts, offer support for his position. We decline to depart from this court's earlier decisions that the opinions of witnesses as to whether the defendant should receive the death penalty are inadmissible.

Defendant also contends that he was denied a fair sentencing hearing when the trial court sustained the State's objections to his counsel's argument that natural life imprisonment was a possible alternative to a death sentence. He argues that because the jury was denied the same information that would be known to a sentencing judge if he had waived his right to have a jury as the sentencer, his rights to due process and equal protection were violated.

In *People v. Bean* (1990), 137 Ill. 2d 65, 116-18, and *People v. Simms* (1991), 143 Ill. 2d 154, 180-82, this court considered and rejected arguments that the jury in a case involving a single murder should be informed of the range of possible prison sentences to which the defendant might be sentenced if he were not sentenced to death. In a multiple-murder case, the trial court should instruct the jury that if it finds mitigating factors

sufficient to preclude imposition of the death penalty, the defendant will be sentenced to natural life imprisonment and that no person serving a natural life term can be paroled or released, except through executive clemency. (*People v. Gacho* (1988), 122 Ill. 2d 221, 261.) However, in single-murder cases, the jury would have to be informed of all the sentencing alternatives possible under the determinative sentencing system in Illinois. Such information would serve to divert the jury's attention from the character of the defendant and the circumstances of the offense, and invites the jury to speculate on possibilities that may or may not occur. The court in *Bean* held that giving the jury such information would be error. (*Bean*, 137 Ill. 2d at 118.) It logically follows that it was improper for defense counsel in the case at bar to attempt to impart this information to the jury in his argument.

The final issue we address is defendant's contention that the prosecution's rebuttal closing argument was replete with erroneous and improper arguments which violated his right to a fair sentencing hearing. Defendant argues that the prosecutor misstated the evidence and asserted facts not in evidence, referred the jury to inapplicable legal principles and made improper and inflammatory appeals to the jurors. Defendant's first series of complaints concern the prosecutor's remarks regarding defendant's prior conviction for the voluntary manslaughter of James Fortner.

With respect to that conviction, evidence was introduced at defendant's sentencing hearing that defendant made a post-arrest statement in which he related that Fortner was the step-father of Kiwanis and LaMar Moore. Following a fight among the Moores and Fortner on May 5, 1982, defendant accompanied the Moores into Fortner's bedroom and held one of Fortner's arms while LaMar beat Fortner on the chest. La-

Mar subsequently choked Fortner with his hands, an electrical cord and a belt as Fortner was being held down by defendant and Kiwanis. Defendant heard Fortner gasping for air, threw him onto the floor and checked for signs of life. LaMar then picked up a pipe and hit Fortner with it to ensure that Fortner was dead.

In rebuttal argument, the prosecutor first recalled the incident involving the earlier battery by defendant and Kiwanis Moore upon James Fortner and then argued:

"[Prosecutor]: But more than that, eight months later, he kills this guy. And these are not separate instances.

You know that on this date, when James Fortner had hit Eddie on the head, and his companion, Kiwanis Moore, who's with him. You know what was happening for eight months? Eight months of simmering. You know Eddie Williams is ticked off this guy hit him on the head.

You know for eight months he's ticked off he had to spend time in jail. The fact he was arrested. Those are not individuals [sic] acts.

[Defense Counsel]: Objection. There's no evidence.

[The Court]: The jury heard the evidence.

[Prosecutor]: They are together. This is a conspiracy to commit murder, I suggest to you, between James—

[Defense Counsel]: Objection, Judge.

[The Court]: Sustained.

[Prosecutor]: Between Eddie Williams, Kiwanis Moore.

[The Court]: There's no evidence of that, Mr. [prosecutor].

[Defense Counsel]: Ask the jury to disregard it.

[The Court]: Jury will disregard that.

[Prosecutor]: Between those two, they killed James Fortner. And the voluntary manslaughter, that's not spontaneous. That doesn't arise out of a fight. That doesn't arise out of a drunken stupor. You heard what happened.

The fact that LaMar Moore said, let's kill that guy. And they crept into his room, and he was sleeping at the time, and that's when Eddie Williams held down the arm while LaMar Moore choked him, used a belt, used a cord. And what was Eddie Williams doing all that time? He was right there.

[Defense counsel] makes a very interesting argument. She says, oh well, he was just, he was just there. He wasn't part of that killing. But on the other hand she says he pled guilty. Of course he pled guilty. He pled guilty to killing a person.

That means he was part and parcel of the killing of that person, and you learned the accountability argument instructions before. Remember those instructions? He aided and abetted. He held down those arms.

[Defense Counsel]: Objection, Judge. That doesn't apply to this sentencing.

[The Court]: Sustained.

[Defense Counsel]: Ask the jury be instructed to disregard about the accountability argument.

[The Court]: Jury will disregard the accountability argument.

[Prosecutor]: Darn right he pled guilty, and you know why? It was coldblooded murder, and our system broke down and gave him a break. They gave him ten years. He would be a fool not to take ten years. You heard those facts. How much more coldblooded is that? He's no fool. He took ten years when he could. He should be doing 120 for that crime.

[Defense Counsel]: Objection, Judge.

[The Court]: Sustained.

[Prosecutor]: And this theme of property. Yes, that graduated from property to violence, and look where it ended up with. Valerie McDonald. That's the final victim.

Let that be the final victim, ladies and gentlemen. The defendant is guilty of murder and he's guilty of a number of aggravating things. And one of those is Eddie Williams likes to be right there when it all happens. He likes to be there, right there in the muck of the violence.

Now, what do I mean? Right there for voluntary manslaughter. He goes right there, holding that arm. He was right there when James Fortner was gasping and falling to unconsciousness. He was right there when LaMar Moore was choking him with a belt, a cord, and his hands. He was right there.

[Defense Counsel]: Object to all this harping on the voluntary manslaughter. We're not here for that.

[The Court]: It's argument, counsel.

[Prosecutor]: I bet he was sitting there when blood splattered all over.

[Defense Counsel]: Objection, Judge.

[The Court]: Sustained.

[Prosecutor]: He was right there with Valerie. He snuck up behind her. I bet you he could smell her perfume when he took the gun and shot her right behind the ear. He's not directing this by remote control. He's right in there. He probably gets a vicarious thrill.

[Defense counsel]: Objection.

[Prosecutor]: Let's be there, let's kill. Right there.

\* \* \*

[Prosecutor]: They ask you to give him a break. I guess that means they want you to let him try to rehabilitate himself. I think looking at that chart, its quite apparent that our society, our justice system, and a number of citizens that he victimized tried to give him a break. And he ignored them all. Didn't mean a thing.

Yes, a number of people didn't come in. \*\*\* They didn't come in for whatever reason. They gave him a break. Did that ever stop his crimewave? Never.

How about Mr. Fortner? He didn't come in. What did that get him? Got him killed.

[Defense Counsel]: Objection, Judge, There's no testimony.

[The Court]: Fair inference.

[Prosecutor]: James Fortner didn't come. And you know why he couldn't come today? He's dead, thanks to Eddie.

This system has given him probation, supervision, one day in jail, light jail sentences. Breaks again and again and again, and Eddie just ignores it. It takes a coldblooded murder, he gets a reducer to voluntary manslaughter. Only ten years.

[Defense Counsel]: Objection to coldblooded murder.

[The Court]: Sustained.

[Prosecutor]: That's the break of the century. My God, he even goes to the penitentiary and they give him a break. Killing someone, he goes to a minimum penitentiary. And even then he has to go to maximum because he breaks their rules. He blew another break."

Defendant maintains that nearly the whole of the prosecutor's argument was improper and inflammatory. Most particularly, defendant objects to the prosecutor's characterizations of and references to the voluntary manslaughter as murder and "cold blooded murder." He argues that he was not convicted of murder in the Fortner case and that the prosecutor's remarks were therefore factually and legally erroneous and highly prejudicial. Defendant also argues that the prosecutor falsely told the jurors that he had also committed conspiracy to commit murder, a statement which, too, was highly prejudicial because the jurors knew from the charges at defendant's trial that conspiracy to commit murder is a crime separate and distinct from murder. Defendant claims that the prosecutor's suggestion that defendant was guilty of Fortner's murder under the law of accountability was another improper characterization of the voluntary manslaughter as murder. Defendant further argues that the prosecutor improperly invited the jury to recall the accountability instructions it heard at trial for the purpose of determining that defendant was actually guilty of murder in the Fortner case.

Defendant also submits that the prosecutor's personal opinions that the system had broken down when he was allowed to plead guilty to voluntary manslaughter and that he should have received a sentence of 120 years instead of 10 were irrelevant and particularly prejudicial and reprehensible because it was the prosecutor's office which had determined that a plea of guilty to voluntary manslaughter and a 10-year sentence were acceptable.

Defendant argues that other remarks of the prosecutor were also improper as being unsupported by the evidence. Those remarks include the prosecutor's statements that defendant had been dealing drugs, that defendant had been "simmering" and "ticked off" at

Fortner for the eight months following the altercation in which Fortner struck him with a hammer, and that Fortner's failure to go to court on that incident "got him killed." As to the last remark, defendant claims that the error was compounded by the trial court's incorrect ruling that it was "a fair inference."

Defendant also notes that although many of his objections were sustained, the prosecutor ignored the rulings and continued on with the very line of argument the trial court had ruled improper. Thus, defendant maintains, neither the sustaining of objections, the admonishments to disregard the improper comments, nor the instruction that arguments are not evidence could ameliorate the prejudice resulting from the prosecutor's remarks.

The State agrees that it was bound by the terms of the plea agreement in the Fortner case and concedes that the comment that defendant should have received a 120-year sentence was improper. The State also acknowledges that the prosecutor's references to "cold blooded murder" were improper. It is the State's position, however, that the prosecutor's argument was justified because defense counsel had grossly minimized defendant's responsibility for Fortner's death which, the State continues to assert, was in fact a vicious, brutal, textbook murder, "defendant's plea to voluntary manslaughter notwithstanding." The State argues that the prosecutor's remarks were invited by defense counsel's misleading argument that defendant's action in restraining Fortner amounted to no more than voluntary manslaughter. According to the State, because there was no dispute as to defendant's degree of participation in the Fortner killing, "only as to the label to attach to it," the jury could not have been affected by any inaccuracies in the remarks of either counsel as to the degree of defendant's responsibility for Fortner's killing.

In the same vein, the State argues defense counsel's remarks were "a blatant misrepresentation of the law and the facts because had the case been prosecuted as charged, defendant could have been convicted of murder on a theory of accountability," and that while the prosecutor's remarks were admittedly improper, they were "undoubtedly motivated by his justifiable outrage at defense counsel's misrepresentations of the facts and law." The State also denies that the prosecutor asked the jury to apply the law of accountability to conclude that defendant committed murder. Rather, the State asserts, the prosecutor simply asked the jury to recall the definition of accountability, *i.e.*, aiding and abetting, in assessing defendant's responsibility for Fortner's killing.

The State maintains that the other comments about which defendant complains, such as that defendant received "breaks" from the system, that the previous altercation with Fortner gave defendant a motive to kill him and that defendant conspired to kill Fortner, were reasonable inferences from the evidence. The State also argues that because the jury was instructed that arguments are not evidence, and because the evidence was not closely balanced, even those of the remarks which were improper could not have resulted in substantial prejudice such that they had an effect on the jury's decision.

It is of vital importance to society and to the defendant that any decision to impose the death penalty is, and appears to be, based upon reason rather than emotion. (*People v. Holman* (1984), 103 Ill. 2d 133, 163.) Because of the qualitative difference between a sentence of death and other forms of punishment, a high standard of procedural accuracy is required in a hearing to determine whether the death penalty will be imposed (*People v. Davis* (1983), 97 Ill. 2d 1, 26-27). The focus in death penalty hearings must be on the particular nature

of and the circumstances surrounding the offense, and the individual character and record of the defendant. (*People v. Szabo* (1983), 94 Ill. 2d 327, 366.) It is axiomatic that parties in closing argument may not go beyond the scope of the evidence presented and facts fairly inferable therefrom (*Holman,* 103 Ill. 2d at 163), misstate the law (*Holman,* 103 Ill. 2d at 170), or express their personal opinions on the evidence (*Holman,* 103 Ill. 2d at 172-73) or on defendant's guilt (*People v. Yates* (1983), 98 Ill. 2d 502, 539). Further, arguments which are calculated to play upon the jurors' emotions are clearly improper. A penalty of death that may have been imposed under the influence of passion or prejudice cannot stand. *Szabo*, 94 Ill. 2d at 367.

Initially, we note that those of the prosecutor's comments quoted above constituted almost the entirety of the State's rebuttal argument. The State's initial closing argument was considerably shorter, its focus being on defendant's progression from property crimes to Fortner's manslaughter and finally to Valerie McDonald's murder. Thus, it cannot be said that any improper remarks were merely isolated comments made in the course of a lengthy and otherwise proper argument.

It is a fundamental principle of criminal jurisprudence that a conviction of a lesser offense operates as an acquittal of a greater offense. (*People ex rel. Daley v. Limperis* (1981), 86 Ill. 2d 459, 466.) Whatever the prosecutor's personal opinion on the nature of defendant's participation in the Fortner killing, the fact remains that defendant was not convicted of murder or conspiracy to commit murder. The prosecutor's statements that defendant participated in a conspiracy to commit murder and that his conduct amounted to cold blooded murder were misrepresentations of the evidence and the law. The remarks were also an improper

expression of the prosecutor's opinion, and an invitation to the jury to join him in his opinion, that the final adjudication in the Fortner case was incorrect and should be reevaluated. Indeed, the prosecutor appealed to the jurors to retry defendant for that offense by directing them to recall the instructions on murder by accountability and by stating that defendant had aided and abetted in Fortner's murder. The State's argument that the prosecutor "simply asked the jury to recall the definition of accountability in assessing defendant's responsibility for Fortner's killing" suggests a continuing, erroneous belief in the appropriateness of such a retrial.

The State's assertion on appeal that the only dispute regarding defendant's participation in the Fortner homicide was merely "the label to attach to it" ignores the clear legal differentiation between adjudications of guilt of voluntary manslaughter and murder. It also demonstrates the same disregard shown by the prosecutor of the mandate that there be a high degree of accuracy in a proceeding to determine whether a defendant should be put to death. The "label" attached to defendant's criminal conduct in the final adjudication of the Fortner case was "voluntary manslaughter," not murder.

We are also not persuaded by the State's argument that defense counsel both invited the prosecutor's improper remarks and incited his "justifiable outrage" by her misleading argument and "blatant misrepresentations of fact and law" regarding defendant's culpability in Fortner's killing. The record reveals that in response to the State's initial closing argument concerning the evidence that defendant restrained Fortner while LaMar Moore beat and strangled him, defense counsel pointed out that Fortner did not die at defendant's hands. Defense counsel acknowledged that defendant was there, knew what was happening and did not stop

it. Defense counsel then accurately stated that defendant pleaded guilty to a lesser crime than murder, that being voluntary manslaughter, for which he received a sentence of 10 years. Defense counsel's brief remarks were neither misleading nor "blatant misrepresentations" of the evidence or law which would justify the prosecutor's embarkation into a protracted, opinionated commentary regarding defendant's murderous intent and conduct in the Fortner homicide. Furthermore, as an officer of the court whose primary responsibility is to ensure that justice is served, a prosecutor is not permitted the indulgence of expressing his personal "outrage" concerning arguments with which he disagrees.

Similarly, the prosecutor's personal opinions concerning the plea agreement reached in the Fortner case were improper. The prosecutor clearly intended to inflame the jury by arguing that the 10-year sentence defendant received was less than one-tenth of what defendant deserved. As defendant argues, this argument was especially unfair and egregious in light of the fact that members of the office which the prosecutor represented had themselves determined the sentence to be reasonable and acceptable punishment for defendant's participation in Fortner's homicide. It was highly improper and inflammatory for the prosecutor to argue that a plea agreement which was entered into by the State and accepted by a court constituted a "breakdown" of the criminal justice system.

We also agree with defendant that there was no evidentiary basis for the prosecutor's arguments that defendant had been dealing drugs, that he was "simmering" throughout the eight months after Fortner struck him with a hammer, and that Fortner's failure to pursue a prosecution against defendant in that matter "got him killed." There was also no basis for the trial court's

ruling that the last remark was "a fair inference" from the evidence.

Beginning with the construction of an eight-foot chart highlighting defendant's past crimes and misconduct, followed by the improper appeal to do justice in the eligibility phase, and culminating in the erroneous, improper, inflammatory remarks in rebuttal closing argument, the prosecutors' conduct appears to have been a calculated course of action to play upon and incite the emotions and prejudices of the jury. Moreover, the prosecutor in rebuttal argument ignored several rulings of the trial court sustaining defendant's objections to his argument and persisted in making improper and inflammatory remarks. We cannot say that the prosecutors' misconduct did not divert the jurors' attention from the issues, including the nature of the offense for which defendant was on trial, defendant's overall character, record and rehabilitative potential. We are unable to conclude that the misconduct of the prosecutors did not serve to increase the likelihood that the jury's verdict was based on emotion rather than reason. Consequently, a new sentencing hearing is required. As a result of this holding, we do not consider whether the death sentence constitutes excessive punishment in this case.

## Conclusion

For the reasons set forth herein, we affirm defendant's convictions of murder and conspiracy to commit murder, but we vacate the sentence of death and remand the cause for resentencing.

*Convictions affirmed;*
*death sentence vacated;*
*cause remanded.*