**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190166-U

Order filed July 22, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | Appeal No. 3-19-0166 Circuit Nos. 17-DT-1334 17-TR-79074 |
| JENNIFER STERNAL, | ) ) ) | Honorable Cory D. Lund, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices Carter and McDade concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*: (1) The circuit court properly granted the defendant's motion to suppress evidence where the defendant was subjected to a custodial interrogation prior to being advised of her *Miranda* rights; and (2) the circuit court did not abuse its discretion in denying the State's request to conduct recross-examination.

¶ 2     The State charged the defendant, Jennifer Sternal, with driving while under the influence of alcohol (DUI). The defendant filed a motion to suppress evidence, which the circuit court granted following a hearing. The State appeals from that judgment.

¶ 3                                        I. BACKGROUND

¶ 4          After being charged with DUI (625 ILCS 5/11-501(a)(2) (West 2016)), the defendant filed a motion to suppress evidence. The motion alleged that the defendant had been seized as contemplated by the fourth amendment and that said seizure was unsupported by a warrant or probable cause. Specifically, the defendant alleged that she was told to enter the backseat of a state trooper's car, creating circumstances in which no reasonable person would have felt free to terminate the encounter. The motion sought to suppress evidence in the form of verbal statements made by the defendant following the alleged seizure.

¶ 5          At the hearing on the defendant's motion, Trooper Kyle Klingen testified that at approximately 10:37 on the night of November 25, 2017, he was dispatched to Interstate 55 in the area of River Road on a report of a vehicle in the ditch. Klingen proceeded southbound on Interstate 55 and exited on River Road. As he exited, he saw the defendant walking on the ramp from northbound Interstate 55 to River Road. He activated his emergency lights, at which point he noticed the defendant begin to jog up the ramp.

¶ 6          Klingen arrived at the defendant's location after she had arrived at River Road. Klingen exited his vehicle and asked, "what was going on." The defendant explained that she had been drinking, had gotten into an argument with her boyfriend, and was kicked out of his car. Klingen noted that they were in "a very rural area with nothing around," so he assumed the defendant was coming from the reported car in a ditch. Klingen asked the defendant questions about the car in the ditch. She denied knowing anything about the car. When Klingen asked whether the car was registered to her, the defendant replied, "I don't think so."

¶ 7          Klingen testified that he was wearing his uniform and his squad car was fully marked. He was standing just outside his car when speaking with the defendant. Klingen testified that he

"asked [the defendant] to have a seat in" his car, but later conceded he could not recall whether he asked her or told her. Klingen testified that he wanted the defendant to be in the squad car because he suspected she was involved with the car in the ditch and had observed the odor of alcoholic beverages on her breath, as well as glassy and bloodshot eyes and her admission to consuming alcohol. Klingen stated that when the defendant entered his car, "[s]he had been detained at that time." He added: "[S]he was not free to leave at that point." Klingen then drove his car down the ramp to the location of the car in the ditch.

¶ 8        Klingen asked the defendant a number of questions while she was in his squad car. After Klingen determined that the car was registered to the defendant, he asked her "to be a little bit more honest" with him. The defendant then provided him with more information.

¶ 9        On cross-examination, Klingen testified that the general area in which he stopped the defendant consisted primarily of farmland and woods. The prosecutor then asked Klingen a series of questions relating to the defendant's explanation that she had been a passenger in her boyfriend's car:

> "[THE STATE]: And did she tell you her boyfriend's name?
>
> [KLINGEN]: No, she did not.
>
> Q. Was anybody else on the scene outside of the vehicle?
>
> A. No.
>
> Q. Did anybody drive by and say, 'Hey, I just dropped off my girlfriend'?
>
> A. No.
>
> Q. And did you ever come in contact with the defendant's boyfriend that evening?
>
> A. No, I did not."

3

Klingen testified that while the defendant was in the squad car, she could have opened the front door. She was not under arrest and not placed in handcuffs. She never indicated that she did not wish to be in the car. Klingen testified that after he established that the car in the ditch was registered to the defendant, he confronted her with that information. The defendant then admitted to Klingen that "she was a little too drunk when she left the bar and she was trying to pull over to call her mom."

¶ 10    On redirect examination, Klingen testified that the defendant was not free to leave the scene when he initially spoke with her, as he suspected she was involved with the car in the ditch. He reiterated that the defendant was detained when she was in his squad car. Klingen confirmed that the defendant "would have gotten in trouble" if she had attempted to open the squad car door while she was in it. Klingen testified that the events in question occurred between 10:30 and 11 p.m. Klingen testified that the ramp area on which he spoke to the defendant was "lit" such that he could see "decently well." He agreed that there was foliage in the area, as well as hills and guardrails, and that he did not search behind those things. Finally, Klingen testified that the defendant did not admit to driving the car during their conversation on River Road, but only admitted as much "later on."

¶ 11    At the conclusion of redirect examination, defense counsel requested that the video recording from Klingen's dashboard camera be played. The following colloquy ensued:

"THE COURT: Then the trooper is done?

[THE STATE]: I do have one or two questions.

THE COURT: Is the trooper done—

[THE STATE]: No.

THE COURT: On redirect?

4

[DEFENSE COUNSEL]: Yes.

THE COURT: Okay, what questions do you have that you could not have asked on cross exam?

[THE STATE]: It is in response to [defense counsel's] redirect. It is very short.

THE COURT: Time doesn't matter. No, I am not going to let you ask any more questions.

[THE STATE]: Okay.

THE COURT: You have had your cross exam."

¶ 12    The dashcam recording was then played in court. The video shows Klingen stop his squad car and walk up to the defendant as she sits on a guard rail. Klingen immediately accuses the defendant of driving the car in the ditch. The defendant insists that she had been a passenger in her boyfriend's car. Approximately three minutes into the encounter, Klingen tells the defendant: "I'm going to have you come over here with me real quick, alright? We're just going to have a seat in my car, alright?" Klingen and the defendant walk toward the squad car and out of the view of the camera. Klingen tells the defendant that he will clear off a seat in the car for her. After some time, Klingen tells the defendant: "Go ahead and have a seat right back there for me." Klingen next asks the defendant: "How come you're crying?" The defendant responds: "Because I've had the worst luck lately. You seem like such a good guy and I know you're just looking out for everybody." Klingen then begins driving. As Klingen approaches the exit ramp, he asks: "You were coming off the ramp here?" Upon arriving at the car in the ditch, Klingen asserts that the car belongs to the defendant, and then asks her: "Do you want to start being a little bit more honest with me about what happened tonight?" The defendant then explains that

5

she realized after leaving a bar that she was "a little bit too drunk" and tried to pull over to call her mother.

¶ 13    The defendant testified that she felt that she "had to" get into Klingen's squad car. She did not feel free to leave, adding that she would have kept walking if she believed that was an option.

¶ 14    Following the defendant's testimony, the State moved for a directed finding. When the court denied that motion, the State called Klingen in its case-in-chief. Klingen's testimony for the State was largely similar to that provided earlier. The State asked again whether Klingen had seen any other pedestrians or people in the vicinity of the car in the ditch. Klingen responded in the negative, and the State did not ask any further questions regarding his search for other people. The State did not ask Klingen about the lighting or topography in the area.

¶ 15    Following the close of evidence, defense counsel argued that Klingen had seized the defendant illegally and had elicited incriminating responses while she was in custody. Defense counsel argued that the defendant had not been free to leave. The State insisted that the encounter had been a proper *Terry* stop from its inception. After arguments, the court asked each party to provide supplementary case law, and it set a date for ruling.

¶ 16    Five days later, the court issued an order granting the defendant's motion and "suppressing all ev[idence] obtained after Trooper Klingen requested the Defenda[nt] sit in his squad car." The State filed a notice of appeal and a certificate of substantial impairment.

¶ 17                                II. ANALYSIS

¶ 18    On appeal, the State argues that the circuit court erred in granting the defendant's motion to suppress evidence. Specifically, the State contends that the defendant was not subject to fourth amendment seizure when she was told to sit in Klingen's squad car because her liberty was not

6

restrained. Alternatively, the State maintains that any seizure was justified by Klingen's reasonable articulable suspicion that the defendant had been driving while intoxicated. The State also argues that the court erred in denying its motion for a directed finding. Finally, the State argues that the court abused its discretion in denying its request for recross-examination of Klingen.

¶ 19 The defendant, meanwhile, concedes that her initial seizure was justified under the community caretaking function, and that the stop was lawfully extended into an investigatory detention under *Terry v. Ohio*, 392 U.S. 1 (1968).[1] In short, the defendant admits that "there was no fourth amendment violation in this case." Instead, the defendant argues that we should affirm the circuit court's suppression ruling because she was subjected to a custodial interrogation while in Klingen's squad car without being advised of her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 20 The State devotes nearly the entirety of its reply brief to an argument that the defendant's position on appeal is improper. First, the State argues that the defendant did not "adequately preserve[ ] this issue for appeal." The State points out that the defendant did not raise *Miranda* grounds in her motion to suppress. It also asserts that defense counsel did not sufficiently raise *Miranda* grounds in his closing argument, arguing that defense "counsel merely flung *Miranda* like the proverbial mud on the wall and hoped it would stick."

¶ 21 The State's argument is irrelevant. It is quite well-settled that a reviewing court "may affirm a trial court's judgment on any grounds which the record supports even if those grounds

---

[1]Curiously, the State spends a significant portion of its reply brief disputing the defendant's concession, continuing to argue that the defendant was not seized at all. However, as the defendant concedes to the legality of every stage of the stop under the fourth amendment, there is no reason for this court to consider the precise grounds on which the stop was justified.

were not argued by the parties." *In re Detention of Stanbridge*, 2012 IL 112337, ¶ 74; see also *People v. Novak*, 163 Ill. 2d 93, 101 (1994) ("The question before a reviewing court is the correctness of the result reached by the lower court and not the correctness of the reasoning upon which that result was reached."). Even in this particular context, our supreme court has made clear that "a criminal defendant may rely on an alternative legal argument in support of an order suppressing evidence," going so far as to point out that the same rule applies at the federal level as well. *People v. Johnson*, 208 Ill. 2d 118, 130 (2003).

¶ 22      In sum, this court is free to contemplate any potential *Miranda* claims, and consider whether the circuit court's suppression order may be affirmed on such grounds. We note that the State's substantive argument on that issue is limited. The State asserts in its reply that this court should reject the defendant's claim "where the facts demonstrate [the defendant] was not placed into custody until Trooper Klingen actually arrested her following the completion of his investigation." The State's single-sentence argument is unsupported by legal citation.

¶ 23                                A. *Miranda*

¶ 24      In *Miranda*, 384 U.S. at 444, the United States Supreme Court prescribed a set of prophylactic warnings that a police officer must provide to a suspect prior to conducting a "custodial interrogation." The *Miranda* warnings assure that any inculpatory statement made by an individual held in custody is not simply the product of " 'the compulsion inherent in custodial surroundings.' " *Yarborough v. Alvarado*, 541 U.S. 652, 661 (2004) (quoting *Miranda*, 384 U.S. at 458). Where an individual is subject to a custodial interrogation without the benefit of the prescribed warnings, the prosecution may not use that individual's statements at trial. *Miranda*, 384 U.S. at 492.

¶ 25        In *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), the Supreme Court held that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police *** that the police should know are reasonably likely to elicit an incriminating response from the suspect." In the present case, the State does not dispute that the defendant was subjected to an interrogation while in Klingen's squad car. After the defendant entered the car, Klingen asked her why she was crying. This question was a blatant attempt to induce the defendant to incriminate herself. Later, while parked on the exit ramp, Klingen broadly asked the defendant if she would like to be more honest—another attempt to adduce incriminating details. We conclude that the defendant was subjected to an interrogation while in Klingen's squad car.

¶ 26        In considering whether an individual is in custody for *Miranda* purposes, we ask if, given the circumstances involved, "a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Circumstances relevant to that analysis include:

> "(1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused." *People v. Slater*, 228 Ill. 2d 137, 150 (2008).

¶ 27        Many of these factors indicate that the defendant was placed in custody. In the dark of night, the defendant was told—not asked—to sit in Klingen's squad car. While Klingen testified

9

that she sat in the front seat, he can clearly be heard in the video telling her to "have a seat right back there." While Klingen was the only officer on the scene, the defendant had no friends, family, or transportation to the area. In order to terminate the interrogation, the defendant would have had to exit the squad car—which, at certain points, was in motion—and proceed on foot in the darkness.

¶ 28    Far more relevant to the above factors, however, is Klingen's repeated testimony that the defendant was not, in fact, free to leave. In essence, Klingen himself testified that the defendant *was* in custody. An officer's subjective belief that a suspect was free to leave is not dispositive. *E.g.*, *People v. Halmon*, 225 Ill. App. 3d 259, 269 (1992). However, we are unaware of any court that has rejected an officer's statement that a suspect was *not* free to leave, and instead found that a reasonable person would have felt otherwise.

¶ 29    Accordingly, we find that the defendant in this case was subjected to custodial interrogation beginning when she entered Klingen's squad car. Klingen was thus constitutionally required to advise the defendant of her *Miranda* rights prior to that interrogation. See *Miranda*, 384 U.S. at 444. Any statements made by the defendant after that point were properly suppressed by the circuit court. See *id.* at 492.

¶ 30    In reaching this conclusion, we also reject the State's related argument that the circuit court erred in denying the State's motion for a directed finding. The State insists that its motion should have been granted where the defendant had failed to make the required *prima facie* showing. Indeed, to survive a motion for directed finding, a defendant must make "a *prima facie* showing that the evidence was obtained illegally." *People v. Jarvis*, 2016 IL App (2d) 141231, ¶ 18. The defendant here, as explained above, presented evidence in her case-in-chief sufficient

10

to actually warrant suppression. It follows *a fortiori* that such evidence constituted a *prima facie* showing, and that the circuit court thus properly denied the State's motion for directed finding.

¶ 31                                B. Recross-examination

¶ 32        It is well-settled that rulings regarding the scope or extent of cross-examination—or recross-examination—lie within the sound discretion of the circuit court. *People v. Williams*, 161 Ill. 2d 1, 43 (1994); *People v. Garner*, 2018 IL App (5th) 150236, ¶ 18. Such rulings will be disturbed only where "an abuse of discretion resulting in manifest prejudice to the defendant" has occurred. *Williams*, 161 Ill. 2d at 43.

¶ 33        "Although circumstances may allow for the exploration on cross-examination of matters not specifically raised on direct examination, re-cross-examination is limited to responding to the testimony brought out on redirect examination." *Id.* at 44. "Where new evidence is opened up on redirect examination, the opposing party must be given the right of cross-examination on the new matter, but the privilege of recross-examination lies within the trial court's discretion." *United States v. Stoehr*, 196 F.2d 276, 280 (1952).

¶ 34        We begin our analysis by addressing *Garner*, a recent case in which the Fifth District found that the circuit court had abused its discretion in applying a "blanket policy" banning recross-examinations. *Garner*, 2018 IL App (5th) 150236, ¶ 19. In that case, the circuit court denied the defendant's request for recross-examination, telling him simply: " 'State gets last shot at a witness when they are their witness.' " *Id.* The Fifth District noted that "there is no such rule," and found the court's policy to be arbitrary and thus an abuse of discretion. *Id.*

¶ 35        In its brief, the State initially asserts that the circuit court in this case denied recross-examination "as a blanket policy." While this is plainly an attempt to invoke the rationale of *Garner*, the State includes minimal supportive argument for that particular point. In this case,

11

after the prosecutor indicated that we wished to respond to redirect, the court told him simply: "No, I am not going to let you ask any more questions" and that the prosecutor had already had his cross-examination. These brief statements cannot be characterized as a blanket policy against recross-examination, and do not give the impression that the circuit court *never* allows recross.

¶ 36 We next consider whether any "new evidence" was adduced on the redirect examination of Klingen, such that the State would have been entitled to recross. At the beginning of redirect examination, Klingen testified that the defendant was not free to leave the area and that she was detained. He had already offered the same testimony on direct examination. *Supra* ¶ 7. While he added on redirect that the defendant would have been "in trouble" had she alighted from his squad car, that is nothing more than a different way of saying she was not free to leave. Klingen also testified on redirect that the encounter occurred between 10:30 and 11 p.m. and that it was dark outside. But he testified earlier that he had been dispatched to the area at 10:37 p.m. (*supra* ¶ 5), and the circuit court may be expected to know that it would be dark outside at that time.

¶ 37 Klingen also testified on redirect that the defendant did not admit to driving while he was speaking to her on River Road. On both direct and cross-examination, however, Klingen had testified that he asked the defendant to be more honest with him only after he ran the car's license plate and discovered it was registered to the defendant. *Supra* ¶¶ 8-9. It was then that the defendant admitted to having driven the car. Thus, the timing of the defendant's admission was already established prior to redirect examination.

¶ 38 Finally, Klingen testified on redirect that the area in question was "lit" such that he could see "decently well" and that he had not searched behind any trees, bushes, hills, or guardrails in the area. On cross-examination, the State had asked Klingen about the topography of the area and whether Klingen had seen anyone else in the vicinity. *Supra* ¶ 9. Even if specific facts, such

12

as the lighting and the presence of hills were newly adduced on redirect, the State had already broached the general topic on cross-examination. Any line of questioning it may have intended on recross could thus fairly have been raised on cross-examination. Indeed, to apply the "new evidence" standard so rigidly as to find recross-examination mandatory here would result in interminable cycles of redirect and recross, depriving the court of its inherent authority to manage the courtroom. At the very least, the court's decision to decline recross-examination in the present case was not arbitrary, fanciful, or wholly unreasonable. See *People v. Lerma*, 2016 IL 118496, ¶ 23 (defining abuse of discretion).

¶ 39 In any event, it is clear that any potential abuse of discretion in denying the State an opportunity for recross-examination resulted in no prejudice to the State. While the State declined to make an offer of proof when its initial request for recross-examination was denied, it subsequently called Klingen as a witness in its case-in-chief. Given that opportunity to question Klingen again, however, the State did not ask any questions about searching for other people, the lighting, or the topography of the area. *Supra* ¶ 14. Had the State had any questions of actual importance to ask Klingen related to the ostensibly "new" facts raised in his redirect examination, it surely would have asked those questions when he returned to the witness stand. It follows that the State plainly suffered no prejudice when it was not allowed to conduct recross-examination.

¶ 40                                    III. CONCLUSION

¶ 41 The judgment of the circuit court of Will County is affirmed.

¶ 42 Affirmed.

13